Anthony D. RAY, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CF–628.

District of Columbia Court of Appeals.

Argued Oct. 8, 1992.
Decided Feb. 19, 1993.

J. Herbie DiFonzo, Alexandria, VA, appointed by this court, for appellant.

James S. Arisman, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and Roy W. McLeese, III, Asst. U.S. Attys., and N. Paul Patterson, Asst. U.S. Atty., Washington, DC, at the time the brief was filed, were on the brief, for appellee.

Before FERREN, TERRY, and SULLIVAN, Associate Judges.

TERRY, Associate Judge:

Appellant Ray was convicted of first-degree murder while armed,[1] carrying a pistol without a license,[2] and possession of a firearm during a crime of violence.[3] His main contention on appeal is that the trial court erred in restricting his counsel's cross-examination of Tawana Owens, the principal government witness. Ray also maintains that his convictions on the firearm counts merged and that it was error for the trial court to impose separate sentences on those counts. We reject these contentions and affirm all of the convictions.

I

At trial the theory of the government's case was that appellant Ray killed Vernice Douglas in order to prevent her from testifying against his brother, Kevin Ray, in a pending drug case in which Kevin Ray, Douglas, and another person had been jointly charged. Regina Berry, a friend and co-worker of appellant's mother, Sherdina Ray, testified that she had been in an automobile with Mrs. Ray and appellant in the area of 18th Street, N.E., about a week or two before the fatal shooting of Vernice Douglas. When they saw Douglas on the street, Mrs. Ray called her over to the car because she wanted to speak to her about Kevin Ray's upcoming trial. During their conversation Douglas and Mrs. Ray discussed the testimony that Douglas was going to give. Whether Mrs. Ray was suggesting that Ms. Douglas perjure herself is unclear from the record. In substance, however, it appears that Douglas was going to say that the drugs involved were not Kevin's and that the marked money which the police found on his person had been given to him by Ms. Douglas in repayment of a loan.

The government's main witness was Tawana Owens. She testified that on the evening of the shooting she and Vernice Douglas decided to go to 18th and D Streets, N.E., to buy crack cocaine. As the two women walked through an alley near their destination, a man approached and asked them if they wanted to buy drugs. They replied that they did, and a sale was made. The seller then asked them to continue through the alley instead of going back the way they came. When Owens asked why, the seller replied that he "didn't want the jumpouts [police officers] to catch him." This seemed to be a reasonable answer, so Owens and Douglas proceeded through the alley toward 19th Street. As they approached the end of the alley, Douglas stopped to smoke some crack, but Owens kept on walking. When Owens was about six or eight feet ahead, she suddenly heard a gunshot behind her. As she turned around, she heard Vernice Douglas say, "Anthony, I am not the one, don't shoot me. I am not going to court."[4] Douglas repeated this statement, and then several more shots were fired. Owens testified that she recognized appellant Ray as the man who shot Vernice Douglas. She also said that, although Ray looked up and saw her standing there, he did not harm her or point his gun in her direction; instead, he fled as people started to enter the alley. Douglas died in the alley without saying anything more.

Dr. Vincent Hill, the Deputy Medical Examiner who performed the autopsy, testified that Vernice Douglas had been shot fifteen times and died from internal hemorrhaging. Powder marks on her clothing showed that at least some of the bullets had been fired from a distance of twenty inches or less.

---

1. D.C.Code §§ 22–2401 and 22–3202 (1989).

2. D.C.Code § 22–3204(a) (1992 Supp.).

3. D.C.Code § 22–3204(b) (1992 Supp.).

4. Two neighbors testified that they heard gunshots and a woman "calling Anthony's name" and crying out, "Anthony, don't shoot me, please don't shoot me," followed by "another volley of shots." Both of these witnesses stated that the woman was saying Anthony's name in a loud voice, "like she was scared."

The defense theory was that some other "Anthony" had killed Vernice Douglas, that because Douglas had no intention of testifying against appellant's brother in his drug case, appellant had no motive to kill her, and that Tawana Owens was actually an accomplice of the true murderer. Defense counsel called three witnesses. Crystal Gladden testified that she saw appellant walking on D Street around 7:30 or 8:00 p.m. when she heard gunshots. She immediately went into her house to check on her child, then came back outside and saw appellant still on the street, not in the alley. Julia Woodward, appellant's godmother, owned a store on 18th Street. She testified that as she entered her store, she noticed appellant standing near a mailbox on D Street. She then heard a number of gunshots, and when she peeked outside, appellant was still there. The final defense witness, Quintinja Williams, testified that she knew both appellant and Vernice Douglas, and that on several occasions Douglas had told her that she was going to testify favorably for appellant's brother [5] at his trial.

## II

■ Appellant argues that the trial court erred in restricting his counsel's cross-examination of Tawana Owens. He asserts that Owens knew that Vernice Douglas' killer was awaiting her presence in the alley, and that inquiry into Owens' "possible role as an accomplice, or at least in an effort to discredit her testimony," was therefore "entirely proper." Despite these assertions, we conclude that the trial court did not abuse its discretion in denying appellant the opportunity to ask Ms. Owens questions on cross-examination that were "highly speculative" and without a factual basis. *See Washington v. United States*, 499 A.2d 95, 101 (D.C.1985).

■ A defendant's Sixth Amendment right to confront adverse witnesses necessarily includes the right to cross-examine.

*Scull v. United States*, 564 A.2d 1161, 1164 (D.C.1989); *Jones v. United States*, 516 A.2d 513, 517 (D.C.1986). But that right is not unlimited. While "exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination," *Davis v. Alaska*, 415 U.S. 308, 316–317, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), the Sixth Amendment does not prevent a trial judge from "imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *see Hayward v. United States*, 612 A.2d 224, 227 (D.C. 1992).[6] For example,

> limits may be imposed to prevent harassment, prejudice, confusion of the issues, or repetitive, cumulative or only marginally relevant questioning, ... to avert danger to or the humiliation of a witness, ... or to guard against the danger that counsel will ask highly prejudicial questions of witnesses with the almost certain knowledge that the insinuations are false.

*Scull v. United States, supra,* 564 A.2d at 1164 (citations and internal punctuation omitted). Additionally, and of particular relevance to the instant case, a proper foundation must be laid before a cross-examiner may pursue a line of questioning suggesting that a witness is biased. *Id.* ("we are loath to allow cross-examination without the establishment of a proper foundation"); *Jones, supra,* 516 A.2d at 517 ("the questioner must proffer 'some facts which support a genuine belief' that the witness is biased in the manner asserted" (citations omitted)); *White v. United States*, 297 A.2d 766, 768 n. 1 (D.C.1972) (counsel "may not ask questions of a witness that are totally groundless" (citation omitted)); *see also* J. STRONG, MCCORMICK ON EVIDENCE § 49, at 187 (4th ed. 1992). Without a clear factual foundation, the cross-examiner must articulate "a 'well rea-

---

5. Kevin Ray, appellant's brother, is the father of Quintinja Williams' child.

6. "It is well settled that although possible bias on the part of a principal government witness is always a proper subject of cross-examination, such inquiry is not without limits." *Hayward, supra,* 612 A.2d at 227 (citation omitted).

soned suspicion' rather than 'an improbable flight of fancy' to support the proposed cross-examination." *Scull, supra,* 564 A.2d at 1164 (citations and footnote omitted). Appellant's contention that the Sixth Amendment permits "skeptical questioning aimed at probing for the truth," notwithstanding the lack of a good-faith basis for an accusation of bias, has no support in the law.[7]

In the case at bar, defense counsel at one point asked Tawana Owens, "Ma'am, isn't it a fact that [the] gunman knew to wait for Vernice in that alley?" The government objected to this question, arguing that counsel lacked a good-faith basis for it. After hearing appellant's proffer,[8] the court sustained the objection on the ground that there was no foundation for the question or for any questions along those lines, adding that counsel could recall the witness later if a basis developed.

On this record, and given the trial court's willingness to allow the defense to recall the witness later if some basis for the questioning became apparent, we hold that the trial court did not abuse its discretion. *See Beynum v. United States,* 480 A.2d 698, 707 (D.C.1984). As we said in *Scull, supra,* "the questioner must support any proposal for cross-examination with a credible statement describing the suspected cause of bias in the witness, supported by plausible factual allegations or itself plausi-

ble within the framework of facts that neither party has contested." 564 A.2d at 1164 n. 4. The connection between the facts cited by defense counsel and the proposed line of questioning was too speculative to support the questions. In our view, counsel's proffer was an "improbable flight of fancy," not the "well reasoned suspicion" that the case law requires. *United States v. Pugh,* 141 U.S.App.D.C. 68, 71, 436 F.2d 222, 225 (1970); *see Porter v. United States,* 561 A.2d 994, 996 (D.C. 1989).

## III

■ Appellant argues that his convictions of carrying a pistol without a license (CPWL) and possession of a firearm during a crime of violence or dangerous offense (PFCV) merged, so that the imposition of separate sentences for the two offenses was impermissible. We disagree. Both the *Blockburger* rule[9] and the legislative history of the PFCV statute support the conclusion that these offenses do not merge and that dual sentences are therefore proper.

■ The Double Jeopardy Clause of the Fifth Amendment assures that a sentencing court may not constitutionally impose multiple punishments for the same offense. *Byrd v. United States,* 598 A.2d 386, 388 (D.C.1991) (en banc). When two legislative provisions apply to and provide

---

7. Appellant cites *Goldman v. United States,* 473 A.2d 852, 857 (D.C.1984), in which this court said that "to satisfy the Sixth Amendment, the trial court should permit exploration of all matters that contradict, modify, or explain testimony given by a witness during direct examination." Read in context, this language does not support appellant's argument. In *Goldman* we were not considering the appropriateness of questions seeking to establish witness bias; rather, the issue was whether the trial court acted improperly in preventing defense counsel from cross-examining the government's only eyewitness about the defendant's identifying characteristics, particularly certain scars which allegedly did not exist at the time of the crime. There is no such issue in this case.

8. Defense counsel listed four facts which he believed supported the proposed line of questioning: (1) that Douglas and Owens "went four blocks out of their way to buy cocaine"; (2) that

they "bought cocaine from somebody that they had not bought from before"; (3) that the gunman saw Owens but did not even point his gun in her direction, even though he fired at least fifteen shots; (4) that the gunman had to be waiting in the alley, and he could not have known that Douglas would walk past him unless Owens led her there.

9. In *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), the Supreme Court held that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." The *Blockburger* test has been codified in D.C.Code § 23–112 (1989). *Whalen v. United States,* 445 U.S. 684, 691–692, 100 S.Ct. 1432, 1437–1438, 63 L.Ed.2d 715 (1980); *Byrd v. United States,* 598 A.2d 386, 389 (D.C.1991) (en banc).

punishment for the same criminal act, the courts must discern from the legislative intent whether the two statutory crimes are the same offense, or whether the separate statutes were intended to allow multiple punishments. *Id.* at 389. In the absence of clear legislative intent to allow multiple punishments for the same act, courts must apply the *Blockburger* test to determine whether the two offenses merge. *Thomas v. United States,* 602 A.2d 647, 649 (D.C.1992); *Freeman v. United States,* 600 A.2d 1070, 1072 (D.C.1991).

In 1989 the Council of the District of Columbia enacted the Law Enforcement Amendment Act, which included a provision *"to establish* the offense of possession of a firearm ... while committing a crime of violence or dangerous crime." D.C. Act 8–129, 37 D.C.Reg. 24 (1989) (emphasis added); *see Freeman, supra,* 600 A.2d at 1072. The existing CPWL statute, D.C.Code § 22–3204, originally enacted by Congress in 1932, was designated as subsection (a), and the new PFCV provision was added as subsection (b). While the Council's purpose in enacting the PFCV statute, section 22–3204(b), was to restrict the use of firearms during the commission of violent crimes such as murder and assault,[10] the intent of Congress in enacting the CPWL statute, section 22–3204(a), was to protect citizens from injury by keeping dangerous weapons off the street, regardless of why they might be carried. *Strong v. United States,* 581 A.2d 383, 387 (D.C.1990); *Roper v. United States,* 564 A.2d 726, 730 (D.C.1989) (CPWL statute was "designed to keep such dangerous items off the street"). Included in subsection (b) is language prescribing a mandatory minimum sentence of five years upon conviction;[11] there is, however, no corresponding language in subsection (a) or in the sentencing statute to

which it refers, D.C.Code § 22–3215. Taking these and other factors into account, we held in *Freeman,* "in view of the nature of the amendment to the Code and the statements in the [legislative history] that a new offense is created, that the Council contemplated that multiple punishments would be imposed." 600 A.2d at 1073; *see* COUNCIL OF THE DISTRICT OF COLUMBIA, REPORT ON BILL NO. 8–185, "LAW ENFORCEMENT AMENDMENT ACT OF 1989," at 3 (1989). Our later decision in *Thomas* was to the same effect. *See* 602 A.2d at 650–653. We conclude that *Freeman* and *Thomas,* read together, are dispositive on the issue of legislative intent.

Even if one could successfully argue that the legislative intent is not clear, the *Blockburger* test would compel the conclusion that the two offenses of CPWL and PFCV do not merge. Under *Blockburger* we must determine "whether each [statutory] provision requires proof of a fact which the other does not." 284 U.S. at 304, 52 S.Ct. at 182 (citation omitted). In applying this test, we "compare the 'statutorily-specified elements of the offenses' in question and not 'the facts of the case as alleged in the indictment.'" *Robinson v. United States,* 501 A.2d 1273, 1275 (D.C.1985) (citation omitted); *accord, Byrd v. United States, supra,* 598 A.2d at 389.

The elements of CPWL are (1) carrying a pistol, either openly or concealed on one's person, outside one's own dwelling or place of business, or other land possessed by the defendant, (2) without a license to do so. No proof is required that the pistol be used in the commission of any crime, or even that it be in the defendant's possession while he or she is committing any crime. *See Rouse v. United States,* 402 A.2d 1218, 1221 (D.C.1979). The elements of PFCV are (1) possession of a firearm or imitation

---

**10.** *See Thomas, supra,* 602 A.2d at 651; *Freeman, supra,* 600 A.2d at 1073.

**11.** D.C.Code § 22–3204(b) (1992 Supp.) provides:

No person shall within the District of Columbia possess a pistol, machine gun, shotgun, rifle, or any other firearm or imitation firearm while committing a crime of violence or dangerous crime as defined in § 22–3201.

Upon conviction of a violation of this subsection, the person may be sentenced to imprisonment for a term not to exceed 15 years and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 5 years and shall not be released on parole, or granted probation or suspension of sentence, prior to serving the mandatory-minimum sentence.

firearm (2) while committing a crime of violence or a dangerous crime (as defined in another statute). *Freeman v. United States, supra,* 600 A.2d at 1073. The lack of a license is an element of CPWL, but not of PFCV. The commission of a crime of violence or a dangerous crime while in possession of a firearm or imitation firearm is an element of PFCV, but not of CPWL. Thus each offense requires proof of a fact that the other does not, and the two offenses do not merge.

The judgment of conviction is accordingly

*Affirmed.*