Herman ELLIOTT, Appellant,

v.

UNITED STATES, Appellee.

Troy R. NERO, Appellant,

v.

UNITED STATES, Appellee.

Nos. 91–CF–1102, 91–CF–1320.

District of Columbia Court of Appeals.

Argued Oct. 6, 1993.
Decided Nov. 4, 1993.

---

1. *See* Snow, *ABC's of Asbestos*, The Washington Times, Sept. 10, 1993, at F1.

Bernard J. Simbole, Arlington, VA, for appellant Elliott.

Derek Sells, Public Defender Service, with whom James Klein and Jo–Ann Wallace, Public Defender Service, Washington, DC, were on the brief, for appellant Nero.

M. Evan Corcoran, Asst. U.S. Atty., with whom J. Ramsey Johnson, U.S. Atty. at the time the brief was filed, John R. Fisher, and Roy W. McLeese, III, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before TERRY and WAGNER, Associate Judges, and PRYOR, Senior Judge.

WAGNER, Associate Judge:

Following a jury trial, appellants, Troy R. Nero and Herman Elliott, Jr., were convicted of first degree murder while armed (D.C.Code §§ 22–2401, –3202 (1989)), possession of a firearm during a crime of violence (D.C.Code § 22–3204(b) (1993 Supp.)), and carrying a pistol without a license (D.C.Code § 22–3204(a) (1993 Supp.)). These offenses arose out of the fatal shooting of Anthony Kearney on March 13, 1990. Appellant Nero argues for reversal principally on the ground that the trial court committed constitutional error and abused its discretion in precluding him from cross-examining the sole eyewitness to elicit bias and the witness' personal motive for committing the murder. He also contends that the court abused its discretion in (1) denying his motions for severance, which he made to avoid any prejudice to his co-defendant by reason of the proposed cross-examination and/or to eliminate prejudice to himself as a result of the admission of his non-testifying co-defendant's statements, (2) denying a requested jury instruction after a jury poll revealed that the verdict reported initially was not unanimous, and (3) admit-ting evidence of his drug use. Appellant Elliott argues that the trial court erred in denying his motion for severance because the evidence against his co-defendant was far greater than the evidence against him. Finding no reversible error, we affirm.

I.

A. *Evidentiary Background*

The government's evidence showed that on March 12, 1990 at approximately 10:40 p.m., appellant Nero, while accompanied by Melvin Smith, shot and killed Anthony Kearney in an alley behind 1615 Rosedale Street, N.E., Washington, D.C.[1] The thrust of the government's case was that Nero killed Kearney at appellant Elliott's behest because Kearney was interfering with Elliott's drug distribution business by robbing his customers. According to one witness, Nero said that Elliott was going to pay him and Smith two $50 rocks of crack cocaine for the murder.

This plot was disclosed essentially through the following evidence presented by the government. Nero, Elliott, Smith, and Kearney all knew each other and had spent time in the neighborhood where the murder occurred. One to two weeks prior to the shooting, Elliott approached an acquaintance, Terry Howard, and asked whether she, her sister and Kearney "were sticking up people in the alley" behind Rosedale Street. Howard denied the accusation, but Elliott warned her that "they had better stop" or "he was going to f[___] [them] up." Two days before Kearney was killed, he borrowed a .357 magnum revolver from someone and traded it with appellant Elliott for some crack cocaine. While at the home of Arlene Mercer[2] the next night, Elliott pointed a .357 magnum at Brenda Thomas and Keisha Cooper, Mercer's neighbors, and accused them of "trying to set him up with [Kearney]."

The following night, Cooper, Thomas, Veronica Anthony, Sadie Chatmon, and Kearney were at Chatmon's house at 606 17th Street, N.E. Appellant Nero came by and asked

---

1. Melvin Smith was also charged in the same indictment, but he was found not guilty in a separate trial.

2. According to the evidence, Mercer's house was a gathering place for smoking crack cocaine.

Kearney in their presence whether he was "going out to get his man," *i.e.*, was he going to commit a robbery that night, and Kearney said that he was not. Later, Nero was alone with Anthony, and he told her that Elliott was going to pay him and Melvin Smith two $50 rocks of crack cocaine for killing Kearney and that they "were going to get their man ... were going to do [Kearney]." Later that evening Nero, Elliott, and Smith were leaving Arlene Mercer's house when Terry Howard heard them say, "let's go get [Kearney] to go to the store with us," and they went back to Chatmon's house to find him. Several witnesses overheard a conversation in which appellant Elliott asked Kearney why he was trying to set him up to be robbed. Sadie Chatmon said she saw a gun in Nero's waistband while alone with him at some point.

Later that night Elliott induced Kearney to go out to steal some shrimp from a Safeway store by promising to trade him some crack cocaine for the shrimp. Nero, Elliott, and Smith left the house a short time later, and within minutes, Kearney followed them. Smith and appellant Nero returned to Mercer's house, and Nero told Smith that he "was going to do" Kearney.

According to Smith's testimony, he and Nero were walking in the alley behind 1615 Rosedale Street when Kearney caught up with them and asked where they were going. They told him they were going to the "bootlegger." Smith testified that while the three were walking in the alley, Nero "pulled out a gun and shot [Kearney]," and Smith and Nero ran in opposite directions out of the alley.

Brenda Thomas, Sadie Chatmon and Veronica Anthony heard gunshots in the alley and saw appellants Elliott and Nero running in the alley a short time after that. Chatmon testified that about this time she heard Elliott tell Nero to "jump the fence." Anthony said she heard Elliott tell Nero to meet him around back. Keisha Cooper testified that she saw Nero and Elliott in the alley after

hearing the gunshots and that Elliott had a gun in his hand. Another witness, Tameshia Fowler, said she heard the shots and saw Nero and another person running down the street.

Arlene Mercer testified that Melvin Smith and appellant Nero returned to her house later that night, "huffing and puffing." About two hours later, appellant Elliott joined them, and Elliott asked Smith and Nero, "Did you do him?" Smith answered "yes" and added, "I could take you to where he is." Appellant Elliott then said, "Kill him for 50 of the rock, 50 of the crack." Tameshia Fowler overheard this conversation, and she saw something heavy and black or brown in Nero's sweatshirt pocket. Fowler also overheard a conversation between Smith, Nero, and Elliott during which one of them said something about "getting paid" for having "done it or done something."

At 4:55 a.m. the morning after the shooting, Nero, Smith, and another person were stopped by the police who were responding to reports of an armed robbery in a mall about three blocks from the scene of the murder. At that time, Smith pulled a .357 magnum revolver out of his pocket and threw it to the ground. Smith testified at trial that the weapon belonged to Elliott.

Tameshia Fowler testified that the day after the shooting appellant Elliott approached her and asked if she had gotten into a detective's car to "snitch." He threatened "to blow up [her] house" if she did. A couple of weeks later, Elliott visited Terry Howard and asked her if she had seen Brenda Thomas, since Thomas "was testifying against [Elliott] on killing [Kearney]." Howard then asked Elliott if he had killed Kearney. Although Elliott denied it, he did tell Thomas that Kearney stole $5000 and Elliott's gun.[3]

### B. *The Taking of the Jury's Verdict*

During jury deliberations, the jury sent a note to the court stating that it had "reached a decision." In open court, the foreperson returned a verdict of guilty on each charge,

---

**3.** Neither appellant testified or called witnesses. They introduced an aerial photograph of the area where Kearney was killed. Appellant Elliott also introduced into evidence a knife which was

found in Kearney's pocket, photographs of the Rosedale Street alley, and transcripts of prior proceedings for impeachment purposes.

for each defendant. At appellant's request, the court polled the jury, and the first six jurors agreed with the verdicts as stated by the foreperson. The seventh juror stated that he did not. The trial court immediately sent the jury back to the jury room, instructing them not to discuss the case further until they heard from the court. Counsel for both appellants moved for a mistrial, claiming that the resumption of deliberations would have a coercive effect on the jury. The trial court allowed the jury to continue to deliberate. Before doing so, in an effort to make it clear that any juror could change his or her vote, the trial court reinstructed them substantially in accordance with CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.93 (3d ed. 1978).[4] The jurors deliberated until excused for the day. The next morning, counsel for appellant requested that the jury be instructed further with the instruction given earlier and the following additional paragraph:

> I specifically instruct you that it is not absolutely necessary that you reach verdicts and you will not be compelled to deliberate further if you conclude and indicate to me that further deliberations will not be useful.

The trial court denied the request. Following further deliberations, the jury returned unanimous verdicts of guilty for each appellant. After their respective sentencings, Nero and Elliott noted these appeals.

## II.

### Appellant Nero's Arguments

### A. Motive and Bias Evidence

Appellant Nero argues that the trial court erred in precluding him from cross-examining Melvin Smith, the sole eyewitness to the shooting, about his independent motive for killing Kearney.[5] Nero's theory was that Smith killed Kearney at Elliott's request in order to protect Elliott's drug business, in which Smith had a financial stake, because it had been affected adversely by Kearney's robberies. He sought to establish this drug enterprise connection by asking Smith on cross-examination whether Elliott had supplied Smith with drugs in the month or two preceding the murder. The trial court prohibited this line of cross-examination, reasoning that the proffered evidence of the alleged criminal relationship was too tenuous, too prejudicial to appellant Elliott, and not supported by clear and convincing evidence that Elliott was the source of the drugs for Smith or that the proffered circumstances were the motivation for Smith to kill Kearney. The court also considered that the close relationship between Smith and Elliott had been brought out through other evidence. Appellant then moved for severance of the trials in order to meet the concern for prejudice to Elliott. The court denied the motion. Appellant contends that these rulings violated his rights under the Confrontation Clause of the Sixth Amendment and constituted an abuse of discretion requiring reversal.[6]

The Sixth Amendment right of the accused to confront the witnesses against him encompasses necessarily the right to cross examine the government's witnesses. *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *Ray v. United States,* 620 A.2d 860, 862 (D.C. 1993); *Parker v. United States,* 586 A.2d 720,

---

4. The instruction given by the court reads as follows:

 Just a little while ago when I was polling the jury, it became apparent that you may not have reached a unanimous verdict; and I just want to tell you how to proceed from here. But because of that, I'm asking you to return to the jury room for further consideration of your verdict. Whenever you have reached a unanimous verdict you may return—you may return it in court. If you are not unanimous, then you should continue your deliberations.

 And after you return to the jury room, any member is free to change his or her vote on any issue submitted to you, and that means

that each juror is free to change his or her vote until the jury is discharged.

5. According to the government's evidence, Smith was an accomplice to the murder. As stated earlier, Smith was acquitted of the offenses related to Kearney's murder in a separate trial. *See* note 1, *ante.*

6. The Confrontation Clause of the Sixth Amendment of the Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. CONST. amend. VI.

722 (D.C.1991) (citations omitted); *Jones v. United States,* 516 A.2d 513, 517 (D.C.1986). An important function of this constitutionally-protected right is the exposure of the witness' biases or motives for not telling the truth. *Parker,* 586 A.2d at 722; *Porter v. United States,* 561 A.2d 994, 996 (D.C.1989). However, the right of cross-examination is not without limits. *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Ray,* 620 A.2d at 862. After sufficient cross-examination has been allowed to satisfy constitutional requirements, the trial court retains broad discretion to determine the scope and the extent of cross-examination. *Roundtree v. United States,* 581 A.2d 315, 323 (D.C.1990) (citing *In re C.B.N.,* 499 A.2d 1215, 1218 (D.C. 1985)). In exercising its discretion, the trial court may restrict cross-examination within reasonable limits to avoid such problems as " 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " *Roundtree,* 581 A.2d at 323 (quoting *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435). The court may also exercise its discretion to preclude cross-examination where the prejudicial effect of the proffered evidence outweighs its probative value. *Roundtree,* 581 A.2d at 323.

■ It is not challenged that a defendant has the right to present evidence that someone else committed the offense for which the defendant is on trial. *See Ray, supra,* 620 A.2d at 863; *(Woredell) Johnson v. United States,* 552 A.2d 513, 516 (D.C. 1989). There is also no question that the trial court's refusal to allow any questioning tending to elicit evidence of bias or evidence from which the jury might make adverse inferences about the witness' credibility is error of constitutional dimension. *Ford v. United States,* 549 A.2d 1124, 1126 (D.C. 1988) (citing *Van Arsdall, supra,* 475 U.S. at 678–79, 106 S.Ct. at 1435). It is appellant's contention that the trial court's rulings precluded his presentation of this type of evidence, resulting in the denial of the right reserved to him under the Confrontation Clause. Recognizing these principles, we turn our focus in greater detail to appellant Nero's proffer of the basis for the motive and bias inquiry.

This proffer is capsulized essentially in the following representation which Nero's counsel made to the court at trial:

> And I may seek to explore the area of Mr. Smith's dependence, either directly on Mr. Elliott or through Mr. Felsen on Mr. Elliott for drug supply. That may entail getting into Mr. Elliott supplying drugs at some time before the day of the charged offense. . . .
>
> I'd submit . . . that the testimony about Mr. Elliott providing drugs to the Mercer household, even in days before, is particularly relevant to Mr. Nero if it comes out, if the foundation is laid, that Mr. Smith had an ongoing connection with that house and that he obtained drugs through that house either directly from Mr. Elliott or from Mr. Felsen. That, your Honor, would tend to establish the connection between Mr. Elliott and Mr. Smith and the dependence of Mr. Smith upon Mr. Elliott that I have submitted, that I may submit to the jury explains why Mr. Smith shot Mr. Kearny [sic], which as the Court knows is Mr. Nero's theory of the defense. . . .

The prosecutor and counsel for appellant Elliott objected to this line of cross-examination, contending that the testimony had been that Smith obtained drugs from Felsen,[7] not from Elliott. Elliott also objected to the absence of clear and convincing evidence of the alleged drug connection, and the government further objected on grounds of the extreme prejudice such evidence would cause appellant Elliott. Elaborating further, appellant Nero pointed out that it was Smith's belief that "the drugs in the Mercer/Felsen household came from Herman Elliott" which he contended was relevant to establish Smith's motive. The court precluded the examination and denied appellant's request for severance.

---

7. Ms. Mercer testified that Johnny Felsen was her boyfriend and that he lived with her in

March of 1990.

In subsequent cross-examination, appellant Nero sought to ask Smith whether Elliott supplied Smith with drugs in the two months preceding Kearney's death. Nero's counsel then made the following representation in support of the request:

> Your Honor, I can't tell the Court that I positively know what his answer will be[,] but I would submit that as I argued yesterday in a different context, to a certain extent, cross-examination is exploratory. I won't lead him. I would ask it in an open fashion. But it is relevant to his credibility and his relationship with Mr. Elliott, and I'd ask to be able to ask him that question.

The government objected, and the trial court denied the request, reasoning that there had been no clear and convincing evidence of such crimes nor even "a good faith belief" that they occurred.[8] Moreover, the court found that the close relationship between Elliott and Smith had been developed through other evidence. We find no constitutional error or abuse of discretion in the trial court's rulings.

■ Evidence that someone other than the accused committed the offense is relevant and admissible at trial "only when it clearly links that other person to the commission of the crime, and a proffer must so indicate."[9] *Ford, supra,* 549 A.2d at 1126; *accord, Ray, supra,* 620 A.2d at 863; *(Woredell) Johnson, supra,* 552 A.2d at 516. As used in this context "clearly link" means "proof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the crime

charged." *(Woredell) Johnson,* 552 A.2d at 516. It is not required that the evidence proffered reach the level of even a strong probability that someone else committed the crime charged. *Id.* at 517. However, the party proposing such cross-examination must lay a foundation which includes at least a proffer of facts (1) supporting a genuine belief that the witness is biased in the manner claimed, and (2) "sufficient to permit the trial judge to evaluate whether the proposed question is probative of bias." *Jones, supra,* 516 A.2d at 517. Appellant's proffer did not meet the foundational requirements.

The trial court found, and the record supports its finding, that appellant lacked a "good faith belief" that Smith ever obtained drugs from Elliott or had a stake in the latter's drug business which appellant claimed provided an additional motive for Smith to commit the murder. Appellant's counsel candidly admitted that his questions on the subject would be exploratory and that he did not know the answers to the line of cross-examination he sought to pursue.

Appellant relies on appeal on the combination of facts in the record and his proffer at trial in support of his claim that the foundation was adequate to allow him to explore on cross-examination of Smith a possible illegal business relationship between Smith and Elliott in the two months preceding the murder. Specifically, appellant Nero cites the following: (1) Smith's testimony at his own trial that Elliott went to the Mercer house regularly to engage in drug transactions and to make money; (2) Smith's friendship with Elliott and the fact that both "hung at Arlene

---

8. Appellant argues that the trial court erred in applying a clear and convincing evidence standard in restricting cross-examination which would elicit other crimes evidence. He argues that the analysis under *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), is not implicated where the proponent of the evidence is *not the government.* Rather, appellant contends that the standard for bias cross-examination is less demanding, requiring only a good faith basis or a well-reasoned suspicion for the inquiry. *See Ray, supra,* 620 A.2d at 863–64. The government takes a contrary position. The government argues that there is no principled reason for applying a different standard where a defendant is the proponent of other crimes evidence, and it urges

this court to follow the decisions of federal courts which it contends have made no such distinction. *See, e.g., United States v. Wright,* 160 U.S.App. D.C. 57, 62, 489 F.2d 1181, 1186 (1973); *United States v. LeFevour,* 798 F.2d 977, 980 (7th Cir. 1986). We need not reach the *Drew* argument because the trial court in fact also ruled applying the less rigorous standard for the admission of bias evidence, and we dispose of the issue on that basis.

9. We have previously recognized that a motive to lie is within the bias doctrine. *Ford, supra,* 549 A.2d at 1125 n. 2 (quoting *Van Arsdall, supra,* 475 U.S. at 680, 106 S.Ct. at 1435–36).

Mercer's house"; [10] (3) that Smith went to Mercer's house the night of the shooting to get high on drugs which he knew were supplied by Elliott; (4) that Elliott knew that Smith smoked crack cocaine; (5) that Elliott mentioned to Smith that night his concern about Kearney plotting to rob Elliott; (6) that Smith's testimony at his prior trial suggested that Smith believed Elliott was the source of the drugs Smith used and obtained from Felsen; and (7) that Smith was arrested with the gun that Elliott brought to Mercer's house earlier that night.

Although this evidence provides areas ripe for exploration of other issues of bias on Smith's part, it does not lay the foundation for an inquiry into the area of bias that appellant sought to pursue. *See Jones, supra,* 516 A.2d at 517 (questioner must proffer facts supporting genuine belief that witness is biased in the manner asserted); *see also Scull v. United States,* 564 A.2d 1161, 1164 n. 4 (D.C.1989). The suspected cause of the bias which appellant asserted was that Elliott and Smith had been engaged in an illegal joint drug-selling venture in the two months preceding the murder, thereby giving Smith a financial stake in any robbery by Kearney of Smith's alleged partner, Elliott. Neither Nero's proffer nor the other evidence in the record discloses any basis for a plausible belief that Smith and Elliott worked together in an illegal drug-selling venture. *See Sherer v. United States,* 470 A.2d 732, 738 (D.C. 1983), *cert. denied,* 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984) (right to cross-examine on prior acts of perjury contingent on showing that perjury actually took place). Too broad a leap is required to make such an inference, which would be speculative at best. Therefore, we find no abuse of discretion in the trial court's ruling that the foundation was inadequate to allow the cross-examination, and clearly no basis for the claim of constitutional error. [11]

---

10. The evidence disclosed that Mercer's house was a gathering place for people to smoke crack cocaine. *See* note 2, *ante.*

11. Given our disposition of this issue, we need not consider appellant's argument that the trial court erred in denying severance on this basis.

## B. Nero's Severance Claim

Appellant Nero argues that the trial court erred in denying severance because he was unfairly prejudiced by the admission into evidence of his co-defendant's statements which he contends would have been inadmissible against him in a separate trial. He contends that the numerous statements introduced, some admissible against both defendants, and some admissible only against his co-defendant, made it difficult for the jury to separate this evidence as to each defendant, thereby causing him prejudice. Nero also argues that the trial court's instructions were inadequate to prevent the prejudice. Finding no clear showing that the trial court abused its considerable discretion in denying severance, we reject this argument for reversal. *See Taylor v. United States,* 601 A.2d 1060, 1063 (D.C.1991).

■■■ A strong presumption arises that persons charged with committing the same offense will be tried jointly. *Id.; Tillman v. United States,* 519 A.2d 166, 169 (D.C.1986). However, severance will be granted where a defendant makes a sufficient showing of prejudice under Super.Ct.Crim.R. 14.[12] *Taylor, supra,* 601 A.2d at 106. Whether to grant severance under Rule 14 is within the trial court's discretion, and in exercising that discretion, the court must weigh the potential prejudice to the defendant against the considerations of judicial economy and expeditious proceedings. *Carpenter v. United States,* 430 A.2d 496, 502 (D.C.), *cert. denied,* 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981). In balancing these interests, some prejudice is permitted. *Id.; see also Payne v. United States,* 516 A.2d 484, 489 (D.C. 1986). Thus, in order to show that the trial court abused its discretion in denying severance, a defendant must show not merely prejudice, but "manifest prejudice." *Payne,*

---

12. Super.Ct.Crim.R. 14 reads in pertinent part as follows:

> If it appears that a defendant or the government is prejudiced by a joinder of ... defendants ... for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

516 A.2d at at 490; *(James A.) Johnson v. United States,* 596 A.2d 980, 987 (D.C.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1987, 118 L.Ed.2d 585 (1992). In light of these principles, we consider the statements which appellant Nero contends prejudiced him during the joint trial.

■ The statements which form the predicate for appellant's severance argument include the following: (1) Terry Howard's testimony that appellant Elliott told her prior to the murder that she, her sister, and Kearney had better stop robbing people in the alley or he would "f[___] them up"; (2) testimony by Howard that a couple of weeks after the shooting Elliott denied shooting Kearney, but said that Kearney had stolen five thousand dollars and Elliott's gun and that he was looking for Brenda Thomas for "testifying against him on killing [Kearney]"; (3) Keisha Cooper's and Brenda Thomas' testimony that Elliott pointed a gun at them two days before the murder and accused them of "setting him up" with Kearney;[13] and (4) Tameshia Fowler's testimony that Elliott told her that if he learned that she snitched on him, "somebody [was] going to blow up [her] house." Appellant argues that these statements attributed to Elliott had a prejudicial spill-over effect upon the jury's consideration of his case. He also contends that the sheer number of statements created a source of jury confusion. We disagree.

None of the statements mention or even refer inferentially to appellant Nero. Appellant argues that the jury might have concluded that Nero was the "somebody" referred to in the statement recounted by Fowler. However, in context with Fowler's other testimony and the remaining evidence at trial, we discern no such danger. While the statements substantially incriminate Elliott, they do not inculpate Nero. The trial court gave a prompt limiting instruction, charging the jury to consider this evidence solely against appellant Elliott. Under these circumstances, there is no substantial risk that the jury improperly considered the statement in determining the guilt of appellant Nero. *See Foster v. United States,* 548 A.2d 1370, 1378 (D.C.1988).

With the exception of the testimony of Cooper and Thomas recounting Elliott's words when he talked to them at gunpoint, the trial court gave appropriate cautionary instructions following the admission of each of the other statements.[14] Having reviewed the record, we conclude that the spillover effect of this evidence, if any, was minimal and that appellant failed to show manifest prejudice on that basis as a result of joinder. *See Payne, supra,* 516 A.2d at 491.

### C. Claim of Jury Coercion

Finally, appellant Nero contends that the trial court abused its discretion in denying his request for a supplemental instruction to avoid the coercive effect of the revelation during a jury poll that the seventh juror did not agree with the verdict returned prematurely. He argues that the instruction as given by the court failed to inform the jury that each juror was free to adhere to a position in spite of the views of the majority and left the impression that the jury would be required to continue deliberations until unanimity was reached.

■ We have recognized that there is some coercive element inherent in every jury poll. *Crowder v. United States,* 383 A.2d 336, 342 (D.C.1978). The trial court has a

13. Brenda Thomas also testified about Elliott's statement when he threatened Thomas and Howard at gunpoint.

14. We reject summarily appellant's contention that the trial court's preliminary instructions to the jury prior to opening statements left the jury to infer that, absent a cautionary instruction to the contrary, they should consider the evidence as bearing upon the guilt of both defendants. The instruction only alerted them that if instructed that certain evidence was to be considered against only one defendant, they should use it in that way. Moreover, the court included an instruction that the jury should "consider the evidence as to each [defendant]" separately. In final instructions, the court reinstructed the jury to that effect.

We note that appellant did not specifically request a cautionary instruction after the testimony about Elliott's threats of Thomas and Cooper at gunpoint. The failure of the court *sua sponte* to instruct the jury was not so clearly prejudicial to the fairness of appellant's trial as to require reversal. *See Mills v. United States,* 599 A.2d 775 (D.C.1991).

measure of discretion in assessing the impact of the revelation of a dissenter during polling and in developing remedial measures to avoid undue coercion. *Id.* at 341; *Harris v. United States*, 622 A.2d 697, 701 (D.C.1993). The trial court's decision will be reversed only for an abuse of discretion, and we find none here.

■ Where jury coercion is claimed in this context, in assessing the argument we examine (1) "the inherent coercive potential of the situation before the court," and (2) actions of the trial court in exacerbating, alleviating or neutralizing any coercive potential. *Harris, supra,* 622 A.2d at 701. We then view these facts together in order "to assess the possibility of actual coercion on any juror or jurors." *Id.* at 701–702. The potential for coercion resulting from the poll in this case was minimal. This is so because it was the seventh juror who expressed disagreement with the verdict, and the positions of the remaining jurors were never revealed.[15] Thus, the seventh juror did not stand in isolation before the court. *See Artis v. United States*, 505 A.2d 52, 58 (D.C.), *cert. denied,* 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986) (coercive potential minimal where juror not isolated as sole dissenter and jury split not revealed); *see also Crowder, supra,* 383 A.2d at 343 (coercive potential greater where twelfth juror revealed as lone dissenter).

Here, the court excused the jury immediately, instructing them first not to deliberate until the court instructed them further. Af-

ter consulting with counsel, the court gave standard criminal jury instruction no. 2.93 before allowing the jury to continue deliberating.[16] The instruction informed them that any juror could change his or her vote until they were discharged.[17] Moreover, the instruction was neutral. It was neither necessary nor prudent for the court to intrude further with the requested instruction where the jury made no inquiry after the court gave the standard instruction.[18] The trial court acted well within its discretion in denying the requested instruction and in carefully alleviating any potential coercive effect inherent in the situation. *See Harris, supra,* 697 A.2d at 706–707. We are satisfied that the jury fairly and freely reached a unanimous verdict.

### D. Evidence of Drug Use

■ Appellant Nero also argues that the trial court abused its discretion in permitting the government to introduce evidence that he smoked cocaine before and after the shooting on the night of the murder.[19] The government contends that the two references to appellant's drug use that night were relevant to the cocaine payment which Nero told the witness that he expected to receive for the crime and completed the chronological sequence of events. Appellant counters that neither smoking episode occurred contemporaneously with the murder, and therefore, the *Toliver* rule for admitting such evidence does not apply. *See Toliver v. United States,* 468 A.2d 958, 960–61 (D.C.1983) (contemporaneous criminal conduct is not "other

15. The manner in which the dissenting juror was revealed, the instruction given by the court thereafter, and appellant's requested instruction are set forth more fully in Part I.B. of this opinion.

16. *See* note 4, *ante* for the full text of the instruction.

17. This procedure is consistent with Super.Ct.Crim.R. 31(d), which provides in pertinent part as follows:

 If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.

18. We reject appellant's argument that our decision in *Crowder,* requires a different result. *Crowder* is factually distinguishable. The potential for coerciveness was far greater there be-

cause it was the twelfth juror who expressed dissent after the other eleven reported a verdict of not guilty. 383 A.2d at 342–43. Thus, some further attempt to "dissipate the potential coerciveness" of the situation was deemed to be necessary. *See id.* n. 11. The assessment of coercion must be evaluated in the context of the circumstances. *Harris, supra,* 622 A.2d at 701. The circumstances of this case are different, and they were adequately addressed by the trial court.

19. The challenged evidence consisted of Sadie Chatmon's testimony that appellant and Kearney were "smoking" in her house on the evening of the murder, and Melvin Smith's testimony that after Kearney's murder, Smith and Nero got "high." The government concedes that it is reasonable to infer from the context of the testimony that the two were smoking "cocaine base."

crimes" evidence, and criminal conduct inextricably intertwined with charged offense is admissible without necessity of cautionary instruction). We need not decide upon the propriety of the admission of this evidence. Having examined the record, we conclude that even assuming error in the trial court's rulings in this regard, they were harmless.[20] *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

### Ill.

#### *Appellant Elliott's Argument*

 Appellant Elliott's sole argument for reversal is that the trial court abused its discretion in denying severance because the evidence against him was *de minimis* when compared with that of his co-defendant. *See Hawthorne v. United States,* 504 A.2d 580, 585 (D.C.), *cert. denied,* 479 U.S. 992, 107 S.Ct. 593, 93 L.Ed.2d 594 (1986). Elliott's claim is belied by the record. There was substantial evidence of Elliott's motive for committing the murder and involvement in the crime. Several witnesses testified that Elliott accused them of participating in a scheme with Kearney to rob him and threatened them for doing so. On the night of the murder, Elliott induced Kearney to go out of the house to a store, and shortly thereafter, witnesses recounted hearing gunshots and seeing Elliott running with Nero in the alley. Another witness recounted that Nero shot Kearney in the alley about that time. Later, Elliott asked Nero and Melvin Smith if they "[d]id him," and Smith offered to take Elliott to him. Elliott then confirmed what Nero had said about what Elliott would pay Nero for the crime. Elliott said, "Kill him for 50 of the rock, 50 of the crack." Given the strength of this evidence against him, appellant Elliott cannot meet the standard for demonstrating manifest prejudice based upon a claim that the evidence against, him was *de minimis* when compared with that of his co-defendant. *See Russell v. United States,* 586

A.2d 695, 698 (D.C.1991); *Hawthorne, supra,* 504 A.2d at 585.

For the foregoing reasons, the judgments of convictions are

*Affirmed.*

---

**20.** The evidence against appellant Nero was substantial. We note that the trial court gave an appropriate cautionary instruction to the jury with respect to the reference to appellant's drug use prior to the crime. Appellant did not request an instruction with respect to the evidence of his use of cocaine after the crime. During discussions of final instructions, appellant's counsel expressly indicated that he was not requesting any instruction about appellant's drug possession.