*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 20-FS-179

IN RE D.M.,
APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(DEL-174-20)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued February 26, 2020   Decided February 27, 2020; Opinion
issued May 4, 2021[*])

*Christen Romero Philips*, Public Defender Service, for appellant.

*John D. Martorana*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Rosalyn Calbert Groce*, Deputy Assistant Attorney General, were on the brief, for appellee.

Before GLICKMAN and EASTERLY, *Associate Judges*, and WASHINGTON, *Senior Judge*.

---

[*] The opinion in this case was originally issued as an unpublished Memorandum Opinion. It is now being published upon the court's grant of appellee's (the District's) motion to publish.

GLICKMAN, *Associate Judge*: This appeal is from a February 21, 2020 order detaining D.M. pursuant to D.C. Code § 16-2310(a-1)(1)(B) (2020 Supp.) pending trial in his delinquency proceeding. After holding oral argument, we issued a Judgment on February 27, 2020, denying D.M.'s motion for summary reversal, granting the District's motion for summary affirmance, and affirming the detention order. The Judgment stated that "[b]ased on the record before us we cannot find that the trial court erred when [it] found that appellant had not rebutted the presumption of detention," and that "[a]n opinion setting forth the court's full reasoning will issue later." This is the promised opinion.

## I.

D.M. was charged in a four-count petition with (1) Carrying a Pistol Without a License — Felony, in violation of D.C. Code § 22-4504(a)(1); (2) Possession of a Firearm without a Registration, in violation of D.C. Code § 7-2502.01; (3) Unlawful Possession of Ammunition, in violation of D.C. Code § 7-2506.01(a); and (4) Unlawful Possession of a Large-Capacity Ammunition Feeding Device[1], in violation of D.C. Code § 7-2506.01(b). At the evidentiary hearing on the motion to detain

---

[1] "[T]he term 'large capacity ammunition feeding device' means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." D.C. Code § 7-2506.01(b).

D.M., the District presented testimony from Metropolitan Police Officer Marta Spajic, who incorporated by adoption her *Gerstein*[2] affidavit. Apart from cross-examining Officer Spajic, D.M. did not present evidence.

According to the District's evidence (which was basically undisputed, and which the court credited), at approximately 1:30 p.m. on February 20, 2020, Metropolitan Police Officer Charles Monk heard five gunshots coming from the 1300 block of Half Street Southwest. He then saw several juveniles running from that area, fleeing an individual who was chasing and shooting at them. After broadcasting a lookout for the shooter as a Black male dressed all in black, Officer Monk saw him (or someone who appeared to be him) in the Unit Block of O Street Southwest. When Officer Spajic drove around the corner, Officer Monk pointed the suspect out to her. At that point, the suspect took "unprovoked" flight. As stated in her *Gerstein* affidavit, Officer Spajic saw D.M., who matched the lookout description, run into the 1300 block of Half Street (between N and O Streets). Within one to two minutes of when Officer Monk first heard the gunshots, Officer Spajic and two other police officers stopped D.M. in front of 1330 Half Street. The officers retrieved a 9mm Glock semiautomatic handgun from D.M.'s pants. The weapon had a magazine and contained one bullet in the chamber and sixteen bullets in the

---

[2] *Gerstein v. Pugh*, 420 U.S. 103 (1975).

magazine, which had a capacity of seventeen rounds. D.M., who was sixteen years old, was not legally able to register a firearm in the District of Columbia.

Based on this unrebutted evidence, the judge found by a substantial probability that D.M. had committed the charged offenses, triggering a statutory rebuttable presumption that his detention was required to protect others from significant harm. The judge asked whether the District relied on anything else in support of its request that D.M. was dangerous and needed to be detained, and counsel for the District cited, *inter alia*, D.M.'s prior consent decree in a case in which he was charged in July 2018 with possession of a controlled substance (PCP), and the fact that he smokes marijuana.[3] The District's counsel also noted D.M.'s apparent connection to the scene of shooting just a minute or two before he was stopped, but stated that the District did *not* ask the judge to infer that D.M. was the person seen chasing and shooting at other juveniles.

The judge then turned to D.M.'s attorney and asked to hear the defense's argument as to D.M.'s dangerousness and the need for his detention. Counsel argued that the rebuttable presumption was overcome because D.M. "was not actually the

---

[3] The Family Court Social Services Division Initial Intake Summary presented to the court states that D.M. "started smoking marijuana at 14, last smoked on 2-20-20 and smokes funnel in his marijuana." This information apparently was provided by D.M. himself.

person who was shooting,"[4] and D.M.'s social history (as summarized in the Family Court Social Services Division Initial Intake Summary) indicated he could be "placed in the community with conditions . . . that would insure both safety to the community and his return to court."[5]  The features of D.M.'s social history on which defense counsel relied in support of that argument were:  (1) D.M. had no prior delinquency adjudications; (2) his only prior contact with the juvenile justice system was for "a totally different type of charge" and (counsel asserted) was "successfully resolved . . . by consent decree," demonstrating that D.M. is "capable of following the rules of the Court"; and (3) comments in the Social Services report indicated (counsel asserted) "a good response to parental authority, that [D.M.] abides by his curfew, and that he is capable of following the rules at home."  The judge inquired about the notation in the Social Services report that D.M. had been the subject of a habitual truancy referral on February 18, 2020.  Counsel for the District explained

---

[4]  In support of that assertion, counsel cited the testimony that D.M.'s gun was fully loaded (arguably implying it had not been fired) and the fact that the District declined to ask the court to infer that D.M. was the shooter.

[5]  That was not the Social Services Division's recommendation, however.  The recommendation was that D.M. "be securely detained pending the next hearing."

that this was a referral to the Office of Attorney General because D.M. had "missed at least 15 days of school."[6]

The judge concluded that D.M. had not rebutted the statutory presumption that his detention was required to protect others from significant harm, and that detention was "the least restrictive setting" in which D.M. could be placed in light of his evident dangerousness. In reaching that conclusion, the judge emphasized that D.M. was carrying "a firearm with an extended clip with 17 rounds in it" in circumstances showing he posed a significant danger to others:

> Whether or not [D.M.] was a shooter, he, according to the facts that were presented to me today was running from a shooting scene and running after others. And I don't know what his involvement was, I only know that this was not just hanging around on the street corner. This was fleeing from a shooting scene in circumstances that suggest a greater degree of danger to others, than merely hanging out with a gun in your pocket. The additional information that [D.M.] is not regularly going to school, is of concern. In addition, it's not like curfews or anything else would have prevented this, this was 1 o'clock in the afternoon.

---

[6] The judge also inquired whether D.M. should have been at school on the afternoon he was arrested. She was informed that the D.C. public schools were on break that week.

## II.

D.M.'s primary contention on appeal is that "even though a rebuttable presumption of detention applies" in this case,[7] he must be released from detention because he successfully rebutted the presumption and the government failed to prove his dangerousness by clear and convincing evidence. D.M. also argues that the judge based her decision on a clearly erroneous factual finding that he was "chasing" other juveniles,[8] and that the judge erred by limiting his cross-examination of Officer Spajic. For the following reasons, we concluded that these claims did not entitle D.M. to relief from the order of detention.

## A.

A child alleged to be delinquent may be placed in detention pending a factfinding hearing when it "appears from available information" that detention is required "to protect the person or property of others from significant harm." D.C. Code § 16-2310(a)(1). Ordinarily, this determination is left to the informed discretion of the trial judge. But the statute further provides "[t]here shall be a rebuttable presumption that detention is required to protect the person or property of

---

[7] Emergency Motion for Summary Reversal of Detention Order at 12.

[8] *Id.* at 7.

others if the judicial officer finds by a substantial probability" that the child committed CPWL or other specified dangerous offenses while armed with a pistol or other firearm.[9]  *Id.* § 16-2310(a-1)(1).  As explained in the legislative history of the "Rebuttable Presumption to Detain Robbery and Handgun Violation Suspects Act of 2006," this presumption "requires the judicial officer to start from the position

---

[9]  "A 'substantial probability' is a degree of proof meaningfully higher than probable cause, intended in the pretrial detention statute to be 'equivalent to the standard required to secure a civil injunction — likelihood of success on the merits.'" *Blackson v. United States*, 897 A.2d 187, 196 n.16 (D.C. 2006) (quoting *United States v. Edwards*, 430 A.2d 1321, 1339 (D.C. 1981) (en banc)).

that the child meets this standard and leaves it to the child to rebut the presumption."[10] *See also Pope v. United States*, 739 A.2d 819, 826 (D.C. 1999).[11]

On appeal, D.M. concedes that the judge, crediting Officer Spajic's testimony, permissibly found by a substantial probability that he committed CPWL, thereby

---

[10] D.C. Council Comm. on the Judiciary, Report on Bill 16-895 at 2 (Nov. 20, 2006). The report explains that the presumption "reinforces the . . . position that gun violence in the District must be dealt with severely" and "express[es] a policy statement by the Council that certain criminal activity is extremely dangerous . . . and will not be condoned." *Id.* at 1, 2. The Council chose to retain this rebuttable presumption in 2017, when it otherwise amended § 16-2310 "to strengthen the presumption against detention of delinquent children so that it is only used when necessary to protect the person or property of others from significant harm or to secure the child's presence at the next court hearing." D.C. Council Comm. on the Judiciary, Report on Bill 21-0683 (the "Comprehensive Youth Justice Amendment Act of 2016") at 8–9, 42; *see also In re K.G.*, 178 A.3d 1213, 1218, 1220 (D.C. 2018) (explaining that "proof that a juvenile has committed an offense with a firearm—a weapon that can cause direct, physical 'significant harm'—is sufficient information to justify a presumption of detention," whereas in the absence of a firearm, "other case-specific information that similarly demonstrates that an individual juvenile . . . presents a threat of direct, 'significant' harm to the person or property of others is necessary to satisfy the strictures of § 16-2310(a)").

[11] In *Pope*, this court explained "the thrust" of the comparable "rebuttable presumption" provision in D.C. Code § 23-1325(a) as being that "[i]f the judge finds by a substantial probability that a defendant has committed first degree murder while armed, then that defendant is presumed to be dangerous (and subject to preventive detention) even if his prior record is clean and if no other showing of dangerousness is made." *Id.* In contrast, "[i]n the absence of a statutory presumption based on a finding of substantial probability the government's burden to prove by clear and convincing evidence that the defendant is properly subject to preventive detention . . . cannot be satisfied simply by reference to the known facts regarding the crime of which the defendant has been accused." *Id.* at 826-27.

triggering the statutory rebuttable presumption that the judge was required to detain him. The issue is whether the judge erred in finding that D.M. did not rebut that presumption. To do that, D.M. needed to "present[] 'proof in contradiction' of it or 'evidence against the fact presumed'"[12] — evidence, in other words, that he did not pose a danger of significant harm to the persons or property of others, or that the danger he posed could be contained by means short of detention.

We conclude that D.M. did not present the necessary "proof" or "evidence" to rebut the presumption. The factors he relied on did not, singly or in combination, amount to such proof. The evidence that D.M. was not the shooter consisted solely of the fact that his Glock pistol and its large capacity ammunition feeding device were fully loaded with a total of seventeen bullets  when the police stopped him shortly after the shooting. That a sixteen-year-old was carrying such armament around with him was proof of his dangerousness, not the opposite — even if he was

---

[12] *In re D.R.J.*, 734 A.2d 162, 164 (D.C. 1999) (quoting *Green v. District of Columbia Dep't of Emp't Servs.*, 499 A.2d 870, 874 (D.C. 1985)). In line with *D.R.J.*, we assume (without finding it necessary to decide in this case) that "while the statute requires the juvenile to come forward with evidence rebutting the presumption, it does not impose on him the burden of persuasion," which "remains on the government." *Id.* at 162. As discussed above, however, in the absence of sufficient evidence rebutting the presumption, the government need prove nothing more for the juvenile to be detained.

not the shooter in this instance (and even if he was not "chasing" other juveniles, a matter we speak to *infra*).

The social factors on which D.M. relied likewise did not rebut the presumption of his dangerousness or provide reason to believe he did not need to be detained for the protection of others. That D.M., at the young age of sixteen, did not have a history of prior delinquency adjudications, but had been arrested "only" once before (for possession of PCP, "a dangerous and destructive drug"[13]) and had resolved the charge with a consent decree, did not constitute evidence of D.M.'s current lack of dangerousness to others. Although D.M.'s counsel asserted that the consent decree "successfully resolved" his prior contact with the juvenile justice system and demonstrated he is "capable of following the rules of the Court," there is scant record support for either of those assertions. The Social Services report states only that the consent decree "[e]xpired" after six months, in February 2019. Presumably, this implies that D.M. fulfilled its conditions, since his delinquency petition was not reinstated.[14] But D.M. put forward no further evidence of his compliance with the

---

[13] *Young v. United States*, 143 A.3d 751, 761 (D.C. 2016) (internal quotation marks omitted); *see also, e.g.*, *Maddux v. District of Columbia*, 212 A.3d 827, 833 (D.C. 2019) (quoting trial court's expressed concern that defendant "might still be using PCP, a drug that causes people to be 'dangerous' and 'wildly unreliable' and 'does horrible things to your brain.'").

[14] *See* D.C. Code § 16-2314(c) (2012 Repl.).

decree (or the court's rules) or whatever counseling or supervision he received under it. If anything, D.M.'s subsequent possession of a loaded pistol and other social information in the report — e.g., that D.M. "is not involved in any structured activities," was truant at school (and failing all his classes), and continued to smoke marijuana — indicate he gained little from "the opportunity for rehabilitation under the guidance of a consent decree."[15] His expired consent decree thus fails to lend any meaningful support to his claim that he would not pose a danger to others if released.

The Social Services report also does not provide evidence for D.M.'s assertions that he has "a good response to parental authority, that [D.M.] abides by his curfew, and that he is capable of following the rules at home." There is only an unelaborated paragraph in the report (under the heading "Social Adjustment") that reads in its entirety as follows:

> The youth stated he has a 10:30 pm curfew. The youth is not involved in any structured activities. No physical or sexual abuse. Some negative peers were reported. He is the co-respondent with [M.W.]. A good response to parental authority.

The report does not say (nor did D.M. present any other evidence) that D.M. "abides" by his curfew or that he follows (or is capable of following) any "rules at home." As

---

[15] *In re C.Y.*, 466 A.2d 421, 429 (D.C. 1983).

for D.M.'s supposedly "good response to parental authority," the source and basis for that opinion are unknown, and it is too vague, conclusory, and unsubstantiated to have any evidentiary weight.[16]

We conclude that the judge did not err in finding that D.M. failed to rebut the presumption that his detention was necessary.

**B.**

We turn to D.M.'s other claims of error. First, D.M. claims the judge based her decision to detain him on a finding that lacks support in the record and is contradicted by the *Gerstein* proffer — to wit, that D.M. was the person Officer Monk saw "chasing" other juveniles after the shooting. We reject this argument because the judge did not base her decision on such a finding. While the judge said (accurately) that "according to the facts that were presented to me today[, D.M.] was running from a shooting scene and running after others," she went on to say that she "[didn't] know what [D.M.'s] involvement was," knew "only" that he "was not just hanging around on the street corner," and merely found that "[t]his was fleeing from a shooting scene in circumstances that suggest a greater degree of danger to others, than merely hanging out with a gun in your pocket." We see no reason to think that,

---

[16] We note that, while D.M.'s parents were present at the detention hearing, he did not call them to testify on his behalf.

in deciding to detain D.M., the judge relied on a finding that D.M. was "chasing" anyone.

Second, D.M. claims the judge erred by precluding his counsel from questioning Officer Spajic about "the content of the lookout [that Officer Monk broadcast for the shooter], whether D.M. matched the description of the lookout, and whether police had reason to believe that D.M. was not the shooter."[17] The short answer to this claim is that any error was harmless given the conclusions we have reached above. D.M.'s detention was not based on his having been the shooter seen by Officer Monk, and the posited cross-examination would not have elicited

---

[17] Emergency Motion for Summary Reversal of Detention Order at 9. D.M. exaggerates the scope of the judge's rulings. On cross-examination, Officer Spajic testified that she recalled hearing one lookout for "one [B]lack male wearing all black clothing"; that if Officer Monk "said anything additional on the radio, I [Officer Spajic] personally didn't catch that"; and that when she saw D.M., he was wearing "[t]he same clothing he's wearing today" (i.e., in the courtroom) plus a "knit skully." The judge precluded defense counsel only from asking these three follow-up questions: (1) "[D]id you hear a radio lookout?" (*after* the officer had testified unambiguously that she did); (2) "Other than saying that the lookout was for a [B]lack male wearing all black clothing, was there any other description given?" (*after* the officer had testified that if there was anything additional, she did not catch it); and (3) whether, by a "skully," Officer Spajic "mean[t] a black cap of some sort?" The judge did not prevent counsel from putting any other questions to the witness. We are hard-pressed to perceive any abuse of discretion by the judge in curtailing cross-examination. *Elliott v. United States*, 633 A.2d 27, 32 (D.C. 1993) ("[T]he trial court retains broad discretion to determine the scope and the extent of cross-examination.") (citing *Roundtree v. United States*, 581 A.2d 315, 323 (D.C. 1990)).

evidence undermining the pivotal fact that D.M. was in possession of a Glock pistol without a license, along with ample ammunition and a large capacity feeding device.

**III.**

For the foregoing reasons, this court affirmed the order of D.M.'s detention, stating that "[b]ased on the record before us we cannot find that the trial court erred when [it] found that appellant had not rebutted the presumption of detention."