**Kareem McCRANEY and Momolu Stewart, Appellants,**

v.

**UNITED STATES, Appellee.**

Nos. 00–CF–358, 05–CO–982, 00–CF–361, 02–CO–117.

District of Columbia Court of Appeals.

Argued Dec. 20, 2007.

Decided Nov. 25, 2009.

Gregory S. Chernack, with whom Roger W. Yoerges, Washington, DC, was on the brief, for appellant McCraney.

Robert S. Becker, Washington, DC, for appellant Stewart.

John P. Mannarino, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Thomas J. Tourish, Jr., Albert A. Herring, and Carolyn K. Kolben, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN AND THOMPSON, Associate Judges, and FARRELL, Senior Judge.*

GLICKMAN, Associate Judge:

Before us are the consolidated appeals of Kareem McCraney and Momolu Stewart. Following their joint trial in 1999, a jury found each of them guilty of first-degree premeditated murder while armed, second-degree murder while armed (as a lesser-included offense of first-degree felony murder), two corresponding counts of possession of a firearm during a crime of violence (PFCV), and other weapons offenses.[1] After their sentencings in early 2000, appellants noted timely appeals. Each appellant subsequently filed a motion in Superior Court for a new trial pursuant to D.C.Code § 23–110 (2001). The trial judge denied Stewart's motion in 2002 and McCraney's motion in 2005, the latter after conducting an evidentiary hearing on McCraney's claims of ineffective assistance. Appellants again noted timely appeals.

In their appeals from the judgments of conviction, appellants claim the trial judge violated their Sixth Amendment rights to present a defense and to confront the witnesses against them by precluding their assertion of a third-party perpetrator defense, excluding relevant testimony of a defense witness, and curtailing their cross-examination of government witnesses for bias. They also claim the judge abused his discretion by not imposing sanctions on the prosecution under the Jencks Act for a governmental failure to preserve a 911 call recording. Appellant Stewart argues that the judge erred as well in denying his motion for a judgment of acquittal. Finally, in his appeal from the denial of his § 23–110 motion, McCraney claims he was denied his Sixth Amendment right to the effective assistance of counsel because the attorney who represented him at trial had a conflict of interest that adversely affected her performance. (Stewart has not raised any issue concerning the denial of his motion for a new trial.)

In order to evaluate appellants' contentions, we find it necessary to describe in some detail the evidence presented at trial. After summarizing that evidence, we shall address the claims of error presented in

---

* Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on January 23, 2009.

1. The felony murder charge was predicated on a charge of attempted armed robbery. The jury acquitted appellants on those two counts.

the direct appeals. We shall turn then to McCraney's § 23–110 motion and his ineffective assistance claim.

We conclude that appellants are not entitled to relief from their convictions. The trial judge's evidentiary rulings did not violate their Sixth Amendment rights, and the alleged loss of a recorded 911 call was not sanctionable under the Jencks Act. Nor did the judge err in denying Stewart's motion for a judgment of acquittal; the evidence was sufficient to permit the jury to find Stewart guilty beyond a reasonable doubt. McCraney's right to effective assistance of counsel was not violated either. Although his trial counsel did have a potential conflict of interest, which arose from the fact that his co-defendant paid the bulk of her legal fees, McCraney has not shown that the conflict adversely affected her performance on his behalf.

## I. The Evidence at Trial

### A. The Government's Evidence

McCraney and Stewart were charged with the January 1, 1997, murder of Mark Rosebure. The murder occurred on the premises of an apartment building located at 1600 E Street, N.E. At the time of his death, Rosebure was visiting his girlfriend, sixteen-year-old Sue Ann Mascall, who lived in that building. As the sole witness to Rosebure's murder, Mascall furnished critical evidence against appellants at trial. Other prosecution witnesses corroborated her account and supplied crucial details.

Mascall testified that she "grew up with" McCraney and used to see him and his friends "like every day." Among those friends were Stewart, whom she described as dark-skinned, and Xavier Gray, who was light-skinned. According to Mascall, McCraney often played craps with Mark Rosebure in her building. In December 1996, she recalled, McCraney "acted upset" after losing money to Rosebure.

On the night of December 31, Mascall and her brother Ricardo watched from a second-floor window as McCraney, Stewart, and three friends celebrated New Year's Eve by "shooting their guns" in the air outside her apartment building. Mascall recalled that McCraney fired a silver revolver and Stewart fired a silver 9mm semiautomatic handgun. Xavier Gray, who was with them, also had a silver 9 mm handgun, which Mascall testified he did not fire. A fourth individual named Halim Flowers fired a shotgun. Mascall testified that she had observed the weapons earlier in the evening, when McCraney was with Ricardo inside her building.

Rosebure visited Sue Ann Mascall on the afternoon of the following day. At approximately 5:45 p.m., as they were speaking in the hallway outside her first-floor apartment, McCraney "banged" on the front door of the building. Rosebure opened the door and let him in. McCraney asked Mascall if the police had come the night before. She told him they had not. Then, Mascall testified, McCraney withdrew a silver revolver from his pocket, pointed the gun at Rosebure's head, and asked him whether he had any money. When Rosebure lifted his hands up in response and shook his head "no," McCraney "started shooting at him."

As McCraney was firing, a second man—allegedly, Stewart—came up behind him. Mascall saw this man reach around McCraney and open fire on Rosebure with a silver 9mm semiautomatic handgun. Mascall did not see the second shooter's face and could not identify him, but she noticed that his gun hand was "dark-skinned."

As the two assailants continued firing, Mascall grabbed Rosebure's arm and tried to pull him into her apartment. He collapsed in the open doorway. Mascall

called out to her father, Carl Johnson, who was inside the apartment. Johnson testified at trial that he heard the gunshots and rushed to the door, where he found his distraught daughter holding her mortally wounded boyfriend. Within moments, other occupants of the building appeared. While they tried in vain to help Rosebure, Johnson called the police. After making the call to 911, he returned to his daughter and attempted to calm her down. At this time, Johnson reported, she told him that "Kareem" had shot Rosebure. Mascall also identified McCraney to the police who arrived on the scene minutes later.

Another prosecution witness, Geraldine Hart, lived in an apartment building two doors up from Mascall's building at 1600 E Street. On the afternoon of January 1, 1997, Hart testified, she was sitting at her window overlooking the alley behind the buildings and observed three men she knew and had seen together many times—McCraney, Stewart and Gray. They were standing in the alley next to a brown car that had a broken side window and a temporary paper license tag taped to the rear window. Hart watched the three men remove guns from the trunk of the car and then walk down the alley toward 1600 E Street. About fifteen minutes later, Hart heard "a lot of shots" from that direction. She then saw McCraney, Stewart and Gray run back to the car, throw their guns into the trunk, and drive quickly away. The driver, Hart said, was McCraney. She called 911 to summon the police.

Eugene Bacote, who lived across the street from Hart, corroborated her account. On the afternoon of January 1, 1997, Bacote testified, he was out walking and saw three men in the alley "right behind" 1600 E Street with a brown car parked nearby. Afterward, when he was back in his own apartment, Bacote heard gunshots and saw three similarly dressed men running from 1600 E Street toward the alley. The men appeared to be trying to "put something in their pockets" as they ran. Bacote did not see the men's faces and could not identify them. However, he testified, he had seen appellants McCraney and Stewart together with a third person in the alley behind 1600 E Street on numerous prior occasions, and he had noticed that they drove a brown Pontiac with paper tags.

The day after the murder, the police located McCraney's car, which was a brown Pontiac with a broken vent window and temporary Maryland license tags.[2] They towed the car to a parking lot at the Fifth District Police Headquarters. Two weeks later, after obtaining a search warrant, the police opened the vehicle's locked trunk and discovered a loaded Ruger .357 magnum revolver, a Lorcin 9 mm semiautomatic handgun, and a framed Urban Services Boot Camp certificate in Stewart's name. A police firearms expert testified that the Lorcin handgun had fired eight of the bullets recovered from the hallway at 1600 E Street and had ejected eleven shell casings recovered from that hallway and the area outside the front door where appellants shot off their guns on New Year's Eve. The firearms expert similarly linked the Ruger revolver to four bullets and six shell casings recovered from the hallway area.

## B. The Defense Evidence

Although neither McCraney nor Stewart testified in his own defense, they presented the testimony of other witnesses.

---

**2.** McCraney's fingerprint was found on the rear view mirror, and (upon executing a search warrant for his home) police recovered a parking ticket for the car in McCraney's name and the owner's manual for the vehicle from his bedroom. McCraney's mother confirmed that he drove the car.

McCraney presented an alibi defense: his aunt and uncle testified that he was at their home in Riverdale, Maryland, on January 1, 1997, along with Xavier Gray, his cousin.[3] The alibi was less than perfect, however, because McCraney's aunt testified that she was not home from 11:00 a.m. to 6:00 p.m., and his uncle similarly testified that he was out from 3:15 p.m. to "[s]omewhere in the area of 5:00 to 5:30" p.m. The alibi also was problematic because it linked McCraney to Gray, whom Mascall and Hart placed at 1600 E Street on New Year's Eve and New Year's Day. Gray was not called to testify.[4]

Stewart undertook to impeach Hart's identification of him. A police detective who interviewed Hart on January 2, 1997, testified that she identified Stewart by his nickname but was unable to describe his appearance (though she could describe McCraney). A second detective testified that Hart did not select Stewart's photograph when she viewed arrays containing his picture on August 11 and September 2, 1997. On the latter date, Hart "hesitated on two photos," one of which was of Stewart, and said "she didn't want to pick the wrong person and that she couldn't tell from those photos."

In addition, Stewart called Michael Evans to the stand. Evans testified that at approximately 6:00 p.m. on January 1, 1997, he was driving a brown Pontiac station wagon with temporary Virginia tags (one of which was taped to the vehicle's rear window) in an alley behind his home in the 1600 block of Rosedale Street, a block away from the alley behind 1600 E Street, when he observed police in the area. Evans later learned that there had been a shooting in the vicinity. Evans's brother and his brother's girlfriend also were present with him in the car. Although appellants conceded that Evans had "absolutely nothing to do with" Rosebure's murder,[5] his testimony was admitted (over government objection) as evidence that Hart might have seen Evans's vehicle rather than McCraney's. The defense supported this theory with photographic evidence suggesting that the temporary tags on McCraney's car were affixed to its bumpers, not its rear window.

## II. Trial–Related Claims of Error

Appellants contend that several rulings by the trial judge deprived them of their Sixth Amendment rights to present a defense and to confront the witnesses against them, and that the judge abused his discretion by declining to sanction the government under the Jencks Act for its failure to preserve evidence. Appellant Stewart further asserts that the evidence was insufficient to support his convictions. In this section, we address each of appellants' trial-related claims of error in turn.

### A. Preclusion of Appellants' Third–Party Perpetrator Defense

▬ At a hearing on the eve of trial, Stewart's counsel Veronice Holt an-

---

3. McCraney's aunt also testified that he had been shot in the leg in December 1996 and was unable to move quickly.

4. In an effort to dissociate himself from the car in which police found the murder weapons, McCraney also called a witness who testified that she thought the vehicle had been abandoned or stolen.

5. During his brief testimony, Evans unexpectedly volunteered that the police "arrested" him on January 1, and that his car consequently remained parked in the alley behind his house for about four hours. The trial judge instructed the jury that Evans "was arrested for a disorderly conduct that had nothing to do with this offense," i.e., the shooting at 1600 E Street. As we discuss below, the judge did not permit Evans to testify that he was stopped and questioned by the police about the Rosebure murder.

nounced appellants' intention to present a so-called *Winfield*[6] or third-party perpetrator defense—the (surprising) gist of which was that Sue Ann Mascall and her brother Ricardo were the real murderers, and that they killed Rosebure in order to rob him of drugs he was carrying. After eliciting a proffer of the evidentiary basis for that claim and finding the proffer wanting, the judge barred appellants from asserting, either in argument to the jury or in leading questions on cross-examination, that Mascall and her brother were guilty of the murder.[7] Appellants argue that the judge thereby abused his discretion and deprived them of their Sixth Amendment rights. We do not agree.

## 1. The *Winfield* Proffer

The most important fact Stewart's counsel proffered was that an unnamed eyewitness—"[a] person who was there on the scene"—had told her that "the last individual" to possess the guns fired outside 1600 E Street on New Year's Eve (the presumptive murder weapons) was Sue Ann Mascall's brother Ricardo. At some point during the noisy celebration, Holt elaborated, the police showed up, and "Ricardo took the guns and hid them." The judge agreed that such eyewitness testimony "would be very powerful evidence . . . that would permit a *Winfield* defense to go to the jury." But when the judge asked Holt if she actually had such testimony to pres-

ent, she refused to state that her source would testify[8]—and she acknowledged having no other witness who could tie Ricardo Mascall to the murder weapons. At trial, appellants never called such a witness, nor did they cross-examine Sue Ann Mascall (or any other government witness) on Ricardo's possession of the guns fired by appellants the night before Rosebure's murder.

Holt further proffered that Rosebure was known to have sold crack cocaine, which he habitually concealed "in his rectum,"[9] and an unidentified witness had said that "on the day [of] the shooting Mr. Rosebure did in fact have a stash and he was going to that area [i.e., 1600 E Street] to sell it and promised to give this individual money after the sale." (At a subsequent bench conference, Holt identified the witness in question as the mother of Rosebure's child, who had been pressing him for money.) No money or cocaine was recovered from Rosebure's body, but Holt represented that his pants were "missing" when the police and paramedics arrived on the scene—suggesting he had been robbed, presumably by Sue Ann and Ricardo Mascall. At trial, however, a paramedic testified without contradiction that Rosebure's pants "were on when I got there."[10] Finally, Holt proffered, the ballistics and medical evidence would be "consistent" with the hypothesis that Rosebure was shot on the porch outside the apart-

---

6. *Winfield v. United States*, 676 A.2d 1 (D.C. 1996) (en banc).

7. The judge explained that, while defense counsel "certainly" would be allowed to cross-examine Mascall (or any other government witness) to show her testimony was a fabrication, counsel "may not cross-examine with a predicate leading question that the reason you in fact fabricated this evidence . . . is because in fact you were involved in this offense."

8. Counsel initially stated she couldn't "say" whether the on-scene eyewitness would testify. When pressed by the judge, she reiterated that "although the person who gave me this information is an eyewitness, I did not say they would testify."

9. Counsel based this assertion on testimony by police at "a prior trial."

10. The paramedics cut off Rosebure's pants and removed his other clothing in order to treat him.

ment building—not in the lobby as Sue Ann Mascall claimed—and then "dragged inside." (Evidence at trial, including testimony that there was no blood outside the building before the paramedics moved Rosebure outside to work on him, tended to refute this hypothesis.)

### 2. Discussion

■■■ A third-party perpetrator defense requires "proof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense."[11] Without such a foundation in the evidence, the defense is unduly speculative and likely only to distract and mislead the jury.[12] A defendant proposing to present a *Winfield* defense therefore must proffer some evidence, either circumstantial or direct, of "a third party's actions, motives, opportunity, statements or declarations against penal interest. Such evidence may consist of one fact or circumstance, or a set of facts or circumstances, which, in the aggregate, establishes the necessary link, connection or nexus between the proffered evidence and the crime at issue."[13]

We agree with the trial judge that appellants' evidentiary proffer was too spec-ulative and insubstantial to show a "reasonable possibility" that Rosebure was murdered by Sue Ann or Ricardo Mascall. Among its other deficiencies, the proffer identified no witness who actually would testify that Ricardo Mascall received the murder weapons on New Year's Eve as counsel alleged;[14] no testimony or other proof that Sue Ann or Ricardo Mascall robbed Rosebure (or rummaged through his clothing before police and paramedics arrived on the scene); no evidence that either of them had any motive to kill or rob Rosebure;[15] and no incriminating statements attributed to either of them. Even if the defense arguably impeached Sue Ann Mascall's testimony that Rosebure was shot in the building lobby with evidence he actually was shot on the porch outside, that discrepancy is not enough to implicate Mascall or her brother in the crime.

■ Our review of a trial judge's ruling barring a *Winfield* defense is for abuse of discretion.[16] We are satisfied the judge exercised his discretion appropriately here.

### B. Preclusion of Bias Cross-Examination

■ When Sue Ann Mascall was on the witness stand during trial, McCraney's

---

11. *Winfield*, 676 A.2d at 4 (quoting *Johnson v. United States*, 552 A.2d 513, 516 (D.C.1989)). In adopting the "reasonable possibility" test, *Winfield* rejected "a more exacting standard of relevance" demanding evidence that "clearly link[s] that other person to the commission of the crime." *Id.* at 2, 5 (internal quotation marks and citation omitted).

12. *See id.* at 5.

13. *Boykin v. United States*, 738 A.2d 768, 774 (D.C.1999) (quoting *Johnson*, 552 A.2d at 516).

14. The trial judge stated that he would have allowed appellants to proceed with their *Winfield* defense had they been able to present such testimony. While the issue is not before us, we have no reason to disagree, though, of course, the mere fact that appellants may have left their weapons with Ricardo on New Year's Eve leaves a lot of questions unanswered. It does not mean that appellants could not have retrieved their weapons on New Year's Day, prior to Rosebure's murder.

15. That a victim's "lifestyle as a drug dealer gave others reason to kill [him]" sufficient to justify a third-party perpetrator defense is an argument we more than once have "rejected." *McCullough v. United States*, 827 A.2d 48, 56 (D.C.2003) (citing *Gethers v. United States*, 684 A.2d 1266, 1272 (D.C.1996)).

16. *See Boykin*, 738 A.2d at 774; *Winfield*, 676 A.2d at 5.

counsel asked her during cross-examination whether Rosebure "had a presence" in the area of Sixteenth and E Streets, N.E., before she became "romantically involved" with him. In response, Mascall said that Rosebure "used to hustle around there." Picking up on that answer, appellants later sought to question her and her father about Rosebure's drug dealing at 1600 E Street on the day he was murdered. The avowed purpose of this proposed cross-examination was not only to support appellants' third-party perpetrator defense, but also to expose Mascall's and her father's motive to mislead the police about the identity of Rosebure's assailants in order to conceal the alleged fact that Sue Ann Mascall was selling drugs with Rosebure when he was killed.[17] The trial judge sustained the government's objection to the latter rationale because appellants proffered no factual basis for believing that Mascall was involved with Rosebure in any drug dealing on the day of his murder.[18]

Without such a factual predicate, the judge ruled, the introduction of evidence that Rosebure was a drug dealer would be "highly and improperly prejudicial" to the government.[19] Before reaching that conclusion, the judge personally examined Mascall outside the jury's presence to ascertain "whether there was any factual basis whatsoever" to justify the inquiry.[20] In answer to the judge's inquiries, Mascall testified under oath that Rosebure was not selling drugs at her building in the hours immediately before his murder; that she was not selling or using drugs then; and that she and Rosebure were not talking about dealing drugs. She denied being "involved in any way with [Rosebure] with anything to do with drugs at all."[21]

Appellants argue that the judge's ruling abridged their Sixth Amendment right to cross-examine Mascall and Johnson for testimonial bias.[22] The question is

**17.** "Clearly," defense counsel argued,

> this witness [Mascall] and this individual [Rosebure], the reason that they are out there is because they are selling drugs in that corridor.... If a witness is selling drugs, ... that is a reason to curry favor with the police.... Because after all, if I am some place selling drugs and the police come and I have a shooting on my hands there, I certainly want to misdirect from the issue of the fact that I have—that I am selling drugs there.

Counsel later argued, more broadly, that "if Mark [Rosebure] is there for the purpose of engaging in criminal activity and these people [Mascall and others] are constantly around him while he is engaging in the criminal activity, it provides them with a motive to lie about our clients."

**18.** The judge agreed with the prosecutor that "[w]hat Mr. Rosebure was doing does not go to the bias of this witness [Mascall]" if she was not involved in selling drugs herself.

**19.** "It's simply asking the jury to speculate," the judge declared,

> injecting this evidence [of Rosebure's drug dealing] solely for the purpose of [in] my judgment of prejudicing the jury in an improper fashion. And it's injecting testimony and evidence which is on the one hand highly and improperly prejudicial and on the other hand not relevant to any material issue in the case.

**20.** "[S]hould this witness surprise me and indicate that she was selling drugs out there at that time," the judge explained, "then [defense counsel's] argument that ... she has some interest ... carries some weight then."

**21.** Stewart's counsel objected that the judge's inquiry was "not an adequate substitute for [her] client's confrontation rights."

**22.** "[B]ias is always a proper subject of cross-examination, and the refusal to allow questioning about facts indicative of bias from which the jury could reasonably draw adverse inferences of reliability is an error of constitutional dimension, violating the defendant's rights secured by the Confrontation Clause." *Cunningham v. United States*, 974 A.2d 240, 245 (D.C.2009); *see Delaware v. Van Arsdall*,

a close one in our view, but we uphold the judge's determination that appellants did not lay a sufficient foundation for the inquiry they wished to pursue.

■■■ In order to pursue a line of cross-examination suggesting that a witness is biased, a defendant must lay "a proper factual foundation."[23] This requirement serves to prevent harassment of the witness, prejudice to the opposing party, confusion of the issues, and unnecessary waste of time; it enables the judge to "guard against the danger that counsel will ask highly prejudicial questions of witnesses with the almost certain knowledge that the insinuations are false."[24] As with other evidentiary rulings, the determination of whether a defendant has laid a satisfactory foundation to proceed with bias cross-examination is a discretionary decision for the trial judge.[25] A judge does not abuse his discretion "by precluding cross-examination where '[t]he connection between the facts cited by defense counsel and the proposed line of questioning [is] too speculative to support the questions.' "[26]

■■■ To lay a proper foundation, the examiner must proffer facts supporting a "genuine belief" that the witness is biased and that allow the judge to evaluate whether the proposed questioning will be "probative of bias."[27] If unable to make such a proffer, the questioner at least "must articulate a 'well reasoned suspicion' rather than 'an improbable flight of fancy' to support the proposed cross-examination."[28] Although these criteria are meant to be "fairly lenient,"[29] they are not trivial; and "[t]he more pointed and directly accusatory the examiner's question, the stricter the foundational requirement becomes[.]"[30] Where, as here, the claim of bias is predicated on the witness's conduct having been felonious, it is appropriate for the trial judge to subject the proffered foundation to a careful evaluation.

■■■ Appellants made a sufficient factual proffer (based on the reported statement of the mother of Rosebure's child, a seemingly credible witness) that Rosebure went to 1600 E Street to sell drugs. That, however, was not the issue. Whether Sue Ann Mascall, or her father, had the alleged motive to testify falsely or misleadingly depended on whether *she* could be implicated in Rosebure's criminal conduct. Appellants could not proffer any factual basis to believe that Mascall sold drugs or assisted Rosebure in doing so; nor did such a basis materialize when the judge put the question to Mascall herself under oath.[31]

475 U.S. 673, 678–80, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

23. *Scull v. United States*, 564 A.2d 1161, 1164 (D.C.1989).

24. *Id.* (internal quotation marks, brackets and citation omitted).

25. *See Brown v. United States*, 683 A.2d 118, 124 (D.C.1996).

26. *Id.* (quoting *Ray v. United States*, 620 A.2d 860, 863 (D.C.1993)).

27. *Id.* at 124–25 (quoting *Jones v. United States*, 516 A.2d 513, 517 (D.C.1986)).

28. *Scull,* 564 A.2d at 1164 (footnote and citation omitted).

29. *Carter v. United States*, 614 A.2d 913, 919 (D.C.1992).

30. *Clayborne v. United States*, 751 A.2d 956, 963 (D.C.2000).

31. The judge clearly had the discretion to conduct a voir dire examination of Mascall outside the jury's presence as an aid to determining whether there might be grounds for the requested bias cross-examination. *See Newman v. United States*, 705 A.2d 246, 259 (D.C.1997). The judge's non-leading questions were unobjectionable, and his sole concern was to find out whether the witness

At best, appellants could argue that *if* Rosebure was selling drugs at 1600 E Street, and *if* Mascall was (even innocently) present when he did so, then—despite the total absence of any evidence or claim of wrongdoing on her part—she (and her father) had a motive to lie about the circumstances of Rosebure's murder in order to avoid her being charged with a drug offense as an aider and abettor. That argument strikes us the same way it struck the trial judge—as unduly speculative. We cannot fault the judge for finding that it fell short of being a "well-reasoned suspicion" that Mascall or her father were biased.[32]

### C. Exclusion of Proffered Testimony from a Defense Witness on Relevance Grounds

█ Stewart's counsel sought to have Michael Evans testify not only that he was driving a brown Pontiac with temporary tags in the vicinity of 1600 E Street around the time of Rosebure's murder, but also that the police stopped his car and detained him for several hours that night for questioning about the murder. As Evans never was charged with Rosebure's

murder and appellants conceded he was not involved in it, the trial judge asked why the additional testimony from Evans would be relevant. Holt argued that the fact that police considered Evans a suspect tended to impeach the government's evidence that Sue Ann Mascall identified McCraney by name to the police within minutes of the shooting, because "if [McCraney] was a suspect, why are [the police] arresting somebody else?"[33] Viewing this rationale as "pure speculation," the judge precluded appellants from examining Evans about his questioning by the police as a suspect in Rosebure's murder.

█ Appellants contend the judge erred in excluding the proffered testimony of Evans as irrelevant and thereby infringed their Sixth Amendment right to present a defense. The testimony would have been relevant, appellants argue, either to discredit the testimony that Sue Ann Mascall promptly identified McCraney or to indicate that the police were skeptical of her identification. (The latter rationale is offered for the first time on appeal.) Whether proffered evidence is relevant or not is a determination "entrusted to the

would say anything (credible or not) that might support the claim of bias; he appropriately did not undertake to evaluate the credibility of the witness's answers. *See id.; see also Brown v. United States*, 740 A.2d 533, 537 (D.C.1999) ("Conditioning bias cross-examination on the court's ability to assess the credibility of the source of the alleged motive runs too close to usurping the jury's function.").

**32.** Appellants also assert that the judge erroneously precluded them from cross-examining Sue Ann Mascall as to whether her brother Ricardo received the murder weapons the night before Rosebure was killed, even though appellants had made a sufficient factual proffer of that fact, and it could have given Sue Ann Mascall a strong motive to lie about who committed the murder. We reject this argument, however, for the simple reason that the

judge never precluded such cross-examination. Furthermore, we have no doubt that the judge would have permitted it. Mascall testified that Ricardo was with appellants and Gray when she first saw their weapons, and even the prosecutor agreed on the record that Ricardo's possession of the guns "the night before [Rosebure's murder] is certainly relevant and probative with respect to whether the individual who is charged or is alleged to have committed the crime may have done so." Appellants mistakenly confuse the narrowly focused ruling on their third-party perpetrator defense with a broad restriction on cross-examination, which the judge never imposed.

**33.** Establishing that Mascall did not immediately identify McCraney presumably would have supported the defense theory that her identification of him was a fabrication.

trial court's sound discretion."[34] We are not persuaded the trial judge abused his discretion in making that decision in this instance.

■■■■■ In general, "a defendant is entitled to wide latitude in presenting evidence tending to impeach the credibility of a witness, especially . . . a key government witness,"[35] and competent evidence that is relevant to that or any other matter in issue is presumptively admissible.[36] For evidence to be relevant, however, it must "tend[ ] to make the existence or nonexistence of a fact more or less probable than would be the case without the evidence."[37] This standard is met so long as "the evidence offered conduces *in any reasonable degree* to establish the probability or improbability of the fact in controversy."[38] A defendant "has no right to present irrelevant evidence."[39]

Like the trial judge, we think the inferences appellants would have asked the jury to draw from the police interrogation of Evans as a suspect in Rosebure's murder are entirely too speculative and illogical to render that testimony relevant. There are obvious reasons why the police treatment of Evans as a suspect does not even remotely impeach the testimony that Mascall already had identified McCraney, nor fairly imply that the police were skeptical of that identification. Even if the police knew that one of the shooters was McCraney, they had reason to consider Evans to be a possible accomplice: they observed him near 1600 E Street minutes after the murder driving a vehicle strikingly similar to that in which Rosebure's assailants reportedly fled; and, according to Mascall and other witnesses, there was at least one other shooter whose identity was still unknown. That other shooter could have been Evans. It would have been poor police work indeed to ignore Evans merely because the police credited Mascall's identification of McCraney. Thus, the fact that the police questioned Evans implies nothing about when Mascall identified McCraney or whether the police disbelieved her. In other words, the proffered evidence that police viewed Evans as a suspect on the night of Rosebure's murder was irrelevant.[40]

## D. Denial of Sanctions under the Jencks Act for Failure to Preserve 911 Call

■■■■ In October 1997, when the grand jury indicted appellants for the murder of Rosebure, the Assistant United States Attorney assigned to the case requested the Metropolitan Police Department's Commu-

---

34. *United States v. Jenkins,* 887 A.2d 1013, 1025 (D.C.2005).

35. *Washington v. United States,* 499 A.2d 95, 101 (D.C.1985).

36. *See Johnson v. United States,* 683 A.2d 1087, 1099–1100 (D.C.1996) (en banc). In *Johnson,* we embraced the balancing test articulated in Federal Rule of Evidence 403, under which relevant evidence properly "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

37. *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977).

38. *Dockery v. United States,* 746 A.2d 303, 306–07 (D.C.2000) (emphasis added; internal quotation marks and citation omitted).

39. *Id.* at 306.

40. For the same reasons, we could not find that appellants were harmed by the judge's ruling; even if the excluded testimony might be deemed relevant, its probative value was minimal at best.

nications Division to prepare a tape of the recorded 911 calls and police radio transmissions relating to that incident. In response to that request, a communications officer searched the master tape maintained by the Division and copied the relevant calls and radio transmissions recorded on January 1, 1997, around the time of the shooting. The resulting "radio run" tape, created on October 17, 1997, included 911 calls made by Hart, Johnson, and an unidentified female caller, plus a dispatcher's communication informing police that a caller (whom the dispatcher did not identify) had reported a shooting at 1600 E Street, N.E. Curiously, the logged time of the dispatcher's communication to police was 20 seconds *before* the logged time of the earliest 911 call.[41] This seemed to imply that the dispatcher must have referred to an earlier 911 call that was omitted from the radio run tape, because the dispatcher would not have known about the shooting until after someone called 911.

Appellants requested the radio run tape in February 1999 and noticed the apparent omission. By then, the original master tape recording of police calls and radio communications made on January 1, 1997, had been recycled (after having been maintained for over a year as required by the applicable MPD records retention policy). As the master tape could no longer be searched, appellants moved the trial court to sanction the government for negligently failing to preserve the putatively lost 911 call, which they posited had been made by Sue Ann Mascall.[42] After holding a hearing and taking testimony from the head of the Communications Division and the officer who prepared the radio run tape, the trial judge denied the sanctions motion. In addition to finding "no evidence whatsoever of any act, omission, or shortcoming by the government … that would warrant the imposition of sanctions," the judge found it "purely speculative on this record" whether there even was a missing 911 call, and if there was, whether it was from Mascall.

Appellants argue that the judge abused his discretion in failing to sanction the government for violating the Jencks Act.[43] No such violation was established, however. While the trial judge found multiple defects in appellants' motion, we need address only one. The preservation and disclosure requirements of the Jencks Act apply only to prior statements made by persons whom the government chooses to call as its witnesses at trial.[44] That limitation dooms appellants' invocation of the Jencks Act here. As the judge found, the evidence did not support appellants' claim that Sue Ann Mascall made a 911 call. Mascall testified that she did not telephone the police. Nor was there evidence that any other government trial witness placed the putative lost call. Accordingly, no sanctionable violation of the Jencks Act was shown.

**41.** The dispatcher's call was logged as having been made at 5:43:20 p.m. on January 1, 1997. The three 911 calls were logged as having been made at 5:43:40, 5:43:50, and 5:44:10 p.m., respectively. The communications officer who transcribed the calls testified that this did not necessarily mean there was a missing call, because the inconsistency could have been attributable to a difference between the police clock and the phone company's clock, or to "some type of technical error in the system." In that event, the officer said,

one (or more) of the recorded calls actually could have preceded the dispatcher's call.

**42.** Appellants conceded that there was no bad faith on the government's part.

**43.** 18 U.S.C. § 3500.

**44.** *See id.*; *Robinson v. United States*, 825 A.2d 318, 326–27 (D.C.2003); *Slye v. United States*, 602 A.2d 135, 138 (D.C.1992).

### E. Denial of Stewart's Motion for Judgment of Acquittal

 Stewart argues that the trial judge should have granted his motion for a judgment of acquittal because the evidence was insufficient to prove his identity as a participant in Rosebure's murder. In support of his claim, Stewart emphasizes that Sue Ann Mascall, the only eyewitness to the shooting itself, did not recognize him as one of Rosebure's assailants, and that Geraldine Hart (the only witness who directly implicated him in the crime) was heavily impeached—most notably, by her repeated failure to select Stewart's photograph even though she professed to know him.[45]

 While appellate evaluation of a claim of evidentiary insufficiency is emphatically not "toothless," it is "deferential."[46] In recognition of the jury's prerogatives in this case, we must view the evidence "in the light most favorable to the government, *giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence.*"[47] The evidence is sufficient to sustain a conviction so long as a rational trier of fact *could* have found the essential elements of the charged offense beyond a reasonable doubt.[48] The evidence "need not *compel*" such a finding in order to pass muster.[49]

The prosecution case against Stewart was no means overwhelming. Nonetheless, we think a rational jury could find the evidence against him sufficiently probative to convict him of Rosebure's murder beyond a reasonable doubt. Hart's identification of Stewart was impeached, but it was "not so inherently unreliable that [it] lacked probative value" entirely.[50] "[I]t would take an exceptional case to take such eyewitness testimony about the circumstances of a criminal offense away from the jury,"[51] and we do not find this to be such a case. The core of Hart's testimony—that she saw McCraney, Stewart and Gray take guns from the trunk of a brown car with a broken window and temporary tags and walk toward 1600 E Street, and that after hearing several shots she saw the three men run back to the car, stow their weapons in its trunk, and drive off with McCraney at the wheel—was corroborated by substantial independent evi-

---

**45.** As Stewart notes, the trial judge commented during a mid-trial colloquy with counsel that Hart was *"one of the most dubious witnesses I have heard in this court in the last six months,"* adding:

> I mean her credibility is about as seriously impeached as any witness I have seen and it was not the easiest question in the world for me to resolve to send this case to the jury because of the incredibility of her identification of Mr. Stewart in light of what happened in those photo arrays. I mean I think she's a woman who can very seriously be impeached and indeed has been in this case.
>
> \* \* \*
>
> There's a serious question about whether she saw or could have seen what she said she saw ... when she fails twice to pick a photo from an array of this person that she

theoretically knew from the neighborhood and saw.

**46.** *Rivas v. United States,* 783 A.2d 125, 134 (D.C.2001) (en banc).

**47.** *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987).

**48.** *Rivas,* 783 A.2d at 134 (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

**49.** *Irick v. United States,* 565 A.2d 26, 31 (D.C.1989) (emphasis in the original).

**50.** *United States v. Brown,* 700 A.2d 760, 763–64 (D.C.1997).

**51.** *Id.*

dence at trial, including the testimony of Mascall and Bacote and the subsequent finding of the murder weapons in McCraney's car. Of particular import, Mascall testified that it was Stewart who fired a silver 9 mm handgun outside her building on New Year's Eve, and forensic evidence supported the inference (though it did not conclusively prove[52]) that the same weapon was used to shoot Rosebure the next day. Furthermore, Mascall said the second shooter had a "dark-skinned" hand. That description fit Stewart—and it did not fit Gray, the only other person whom Mascall saw with a 9 mm handgun on New Year's Eve and whom Hart saw in the alley at the time of the shooting.

We are satisfied that a rational trier of fact could find Hart's identification of Stewart credible in spite of its weaknesses. Viewing the evidence in its totality, we conclude that the trial judge did not err in denying Stewart's motion for a judgment of acquittal and allowing the case against him to go to the jury.

### III. McCraney's Collateral Attack on His Conviction

In January 2004, four years after his sentencing, McCraney moved for a new trial pursuant to D.C.Code § 23–110 on the ground that his trial counsel, Linda Sroufe, was burdened by a conflict of interest that adversely affected her performance. The conflict arose from the fact, which had not been disclosed to the court previously, that the majority of Sroufe's legal fees were paid by McCraney's co-defendant. According to McCraney, Sroufe's conflicting loyalties to him and Stewart led her to advise him against taking the stand in his own defense at trial even though he allegedly could have exculpated himself by implicating Ricardo Mascall in Rosebure's murder.

In addition to McCraney, Sroufe and Holt (Stewart's trial counsel) testified at the hearing on his motion. At the conclusion of the hearing, the judge denied relief, finding that (1) McCraney had waived the potential conflict created by the challenged fee arrangement, and (2) in any event, the conflict of interest had not adversely affected Sroufe's performance on McCraney's behalf.

On appeal, McCraney contends that both findings were erroneous and that the judge abused his discretion in denying his § 23–110 motion. The government concedes that McCraney did not validly waive his counsel's potential conflict,[53] but it defends the judge's alternative holding that the conflict had no adverse impact on counsel's representation. As the latter issue turns largely on the judge's credibility assessments and factual determinations, we begin by summarizing the testimony adduced at the § 23–110 hearing.

#### A. The Section 23–110 Hearing

There was no dispute at the § 23–110 hearing that Stewart had paid the majority of McCraney's legal fees; on that point, Sroufe and Holt confirmed the essential

---

52. Because some 9 mm shell casings found outside 1600 E Street apparently could not be linked to the semiautomatic handgun used to shoot Rosebure, it is possible they were ejected from another such gun. If so, then it is possible Stewart was firing that gun on New Year's Eve and someone else had the murder weapon.

53. Brief for Appellee at 65 n. 51. The government's concession on this point is a prudent one, and we accept it. There can be no waiver without an informed consent, but so far as the record shows, Sroufe never explained to her client the particular risks created by his co-defendant's payment of her fees. *See Veney v. United States,* 738 A.2d 1185, 1195 n. 12 (D.C.1999); D.C. Rules of Prof'l Conduct 1.7(c).

details of McCraney's testimony. In brief, after having been represented prior to trial by four different court-appointed lawyers, McCraney met with Stewart and told him he wanted to retain counsel of his own choosing. Stewart agreed to help McCraney pay for one. A week later, Stewart's counsel Holt introduced McCraney to Sroufe, who offered to represent him for a total fee of $8,000. Holt told McCraney he would need to pay only $3,000 of that sum because Stewart would pay the balance. McCraney agreed to that arrangement and Sroufe became his counsel.

Prior to trial, McCraney testified, he informed Sroufe that when the police arrived outside 1600 E Street on New Year's Eve, he and the other persons who were shooting their guns in the air went upstairs to Ricardo Mascall's apartment and left their weapons in Ricardo's keeping. Ricardo "had all the weapons and he put them up somewhere in his house." To McCraney's knowledge, Ricardo Mascall thus was "the last one in possession" of the guns allegedly used in the shooting the next day. According to McCraney, he also told Sroufe that he had given his car to Ricardo Mascall approximately three to five weeks before the shooting. (In his testimony, McCraney did not explain the circumstances under which that alleged transfer of possession took place.)

McCraney further testified that he met with Sroufe, Holt and Stewart at the D.C. Jail during trial and expressed to them his desire to testify about Ricardo's possession of the murder weapons and the car. In McCraney's words, Holt was "very displeased" with that prospect because his testimony would open the door to the admission of evidence that one of the weapons used to shoot Rosebure also "was used in two of my co-defendant's [Stewart's] other cases in which I wasn't his co-defendant on." If McCraney insisted on testifying, Holt warned him, "she would have to sever our defense and point the finger at me in order to save her client."

McCraney testified that Sroufe was largely silent during this discussion, but that when he asked her for her advice, she agreed with Holt. The meeting at the Jail concluded without a decision being reached, but McCraney later decided not to take the stand. He said he was persuaded by Holt's argument that it would not be in his interest for the jury to hear the other-crimes evidence she described.

In their hearing testimony, Sroufe and Holt disputed details of McCraney's account, but they agreed that Sroufe knew of Holt's opposition to McCraney's desire to testify at trial. Sroufe remembered that Holt told McCraney she would withdraw from the case if he decided to take the stand, and that Holt instructed Stewart to "tell [his] co-defendant not to testify."[54] Sroufe also acknowledged that she seconded Holt's recommendation that McCraney not testify. Sroufe insisted, however, that she advised McCraney against testifying only because the substance of his testimony would have been detrimental to his case, and not in order to protect Stewart.

Sroufe and Holt denied that McCraney told them Ricardo Mascall possessed the murder weapons or the car in which those weapons were found.[55] According to

---

**54.** Holt denied making those particular statements. Both she and Sroufe denied that she had raised the specter of other-crimes evidence to dissuade McCraney from testifying. Holt testified that her objection to his taking the stand was based on his poor demeanor at counsel table in the jury's presence and on

her doubt that he could withstand cross-examination.

**55.** Holt further testified that McCraney was not the unnamed eyewitness who, according to her *Winfield* proffer, saw Ricardo receive the guns on New Year's Eve. Sroufe testified

Sroufe, McCraney attributed Sue Ann Mascall's accusation of him to her ire at his rejection of her romantic advances, not to any desire to shield her brother. Furthermore, Sroufe testified, McCraney admitted to her that he had parked his car where the police found it, and he could not explain how the murder weapons came to be in the car's trunk. Sroufe feared that McCraney would face a "hammering" cross-examination on that damning fact if he testified. ("I told him the government's going to ask you how those guns got in your car, what are you gonna say? And I said you're just gonna say I don't know and he agreed with that.") She thought his testimony would only subvert the efforts of the defense at trial to dissociate McCraney from the car by suggesting that the vehicle had been abandoned.

Additionally, Sroufe testified, McCraney told her that Rosebure had once robbed him. If McCraney mentioned that robbery in his testimony, Sroufe believed, the jury would think it simply gave him a stronger motive to kill Rosebure. Sroufe also was concerned that McCraney would have difficulty explaining why (as his own mother testified at trial) he absented himself from the District of Columbia for a period of six months following the shooting—behavior the government would ask the jury to construe as flight manifesting consciousness of guilt. To Sroufe, the risks of putting McCraney on the stand outweighed the possible benefits. Indeed, Sroufe stated that she eventually asked him point blank if he could furnish any testimony that would not be cumulative of other defense evidence. McCraney an-

swered that he could not and then said he did not want to testify.

## B. The Trial Judge's Ruling

The trial judge denied McCraney's § 23–110 motion because, on the central point at issue, he disbelieved McCraney and believed Sroufe and Holt. The judge agreed that it would have been a "plausible strategy" (notwithstanding the risks) for McCraney to have testified at trial that he and his friends left their guns with Ricardo Mascall on New Year's Eve and that Ricardo had control of the car in which the murder weapons subsequently were found. However, the judge found, McCraney never told Sroufe or Holt that Ricardo Mascall had the guns or the car, and there was no credible evidence that he would have implicated Ricardo had he testified at trial. His claim that he would have done so was a fabrication, the judge concluded, "concocted out of whole cloth by Mr. McCraney in an attempt to extricate himself" from his post-conviction predicament.

The judge also credited Sroufe's explanation for advising McCraney against testifying, finding that Sroufe "had no reason to believe [McCraney] could help himself" by taking the stand and "every reason to believe" he would hurt himself.[56] Indeed, the judge found those reasons "absolutely compelling" and "[could] not imagine competent, wholly unconflicted counsel giving Mr. McCraney anything other than the advice that Ms. Sroufe gave him." Under the circumstances, the judge concluded, the alternative of putting McCraney on the stand at trial was an "utterly implausible"

that she never asked Holt who that witness was because she surmised that Holt had obtained the information from Stewart. Sroufe also stated that she considered Holt's witness proffer to be "hypothetical" rather than a firm statement that the defense had a witness who actually could be produced.

**56.** The judge also credited Holt's testimony that McCraney's behavior at counsel table had not made a good impression on the jury.

strategy lacking even a "remote possibility of success." In view of the soundness of Sroufe's advice, the judge ruled, McCraney had failed to show that his counsel's performance was affected adversely by her alleged conflict of interest.

## C. Discussion

■ "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."[57] On the record before us, given the trial judge's credibility findings, McCraney did not make that necessary showing.

■ McCraney did establish that his lawyer had a potential conflict of interest because Stewart's payment of her fees *could have* given her an incentive to prefer Stewart's interests to McCraney's differing interests at trial.[58] But "[a]n 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance."[59] Otherwise put, an attorney has an "actual," as opposed to a potential, conflict of interest only when "the attorney's and the defendant's interests 'diverge with respect to a material

factual or legal issue or to a course of action.'"[60] On that score, McCraney showed that his lawyer recommended a strategy that appeared to serve Stewart's interest despite McCraney's own contrary inclination: in line with the expressed preference of Stewart's counsel, Sroufe advised McCraney to forego his desire to testify in his own defense. To make out a Sixth Amendment violation, however, McCraney also needed to show that Sroufe's advice was against his *interest*, not merely his inclination.

In other words, McCraney needed to show that Sroufe's advice not to testify was unsound. If an attorney renders sound advice to a client, the Sixth Amendment is not violated merely because that advice serves the attorney's other interest as well.[61] "Such a situation occurs when a trial attorney [justifiably] rejects a strategy as being 'specious' or because it could negatively affect 'the credibility of [the defendant's] entire case.'"[62] "An alleged conflict of interest that obstructs the use of a particular strategy or defense is not significant unless the defense is plausible," meaning it was available and realistically "might have influenced twelve reasonable jurors."[63] Thus, to show that his Sixth

57. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *see also id.* at 350, 100 S.Ct. 1708 ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."); *Strickland v. Washington*, 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("Prejudice is presumed ... if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' ").

58. *See Veney v. United States*, 738 A.2d 1185, 1194 (D.C.1999).

59. *Mickens v. Taylor*, 535 U.S. 162, 172 n. 5, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002).

60. *Veney*, 738 A.2d at 1192–93 (quoting *Winkler v. Keane*, 7 F.3d 304, 307 (2nd Cir.1993), and *Cuyler*, 446 U.S. at 356 n. 3, 100 S.Ct. 1708 (Marshall, J., concurring in part and dissenting in part)).

61. *See id.* at 1197.

62. *Id.* (quoting *United States v. Gambino*, 864 F.2d 1064, 1072 (3rd Cir.1988)).

63. *Fitzgerald v. United States*, 530 A.2d 1129, 1138 (D.C.1987) (quoting *Foxworth v. Wainwright*, 516 F.2d 1072, 1079–80 (5th Cir. 1975)). *See also Gambino*, 864 F.2d at 1070 (explaining that the defendant "need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative").

Amendment right to the effective assistance of counsel was infringed, McCraney must demonstrate (1) that "some plausible alternative defense strategy or tactic might have been pursued" but was not, and (2) that the alternative defense was "inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."[64]

■ McCraney argues that but for his counsel's conflicted advice, he would have pursued the plausible defense strategy of taking the witness stand in his own defense and exculpating himself by implicating Ricardo Mascall in Rosebure's murder. As McCraney recognizes, however, this argument founders on the trial judge's finding that he never told Sroufe he could testify about Ricardo's possession of the murder weapons and the getaway car. "Anchored" as that finding was in the judge's first—hand assessments of the witnesses' credibility—instead of believing McCraney, the judge believed Sroufe (and Holt, who corroborated her)—it is well nigh unassailable.[65] McCraney argues that Sroufe was unworthy of belief in view of her testimony that she never asked Holt to divulge the identity of the eyewitness who allegedly said the guns were left with Ricardo on New Year's Eve, even though she and Holt were presenting a joint defense.[66] The argument is not without force—one would think Sroufe surely would have sought to know more about such a witness, unless she already knew the witness was her own client—but it does not persuade us that Sroufe's testimony was so "inherently incredible" that the trier of fact had to reject it as a matter of law.[67]

As we therefore must accept the trial judge's findings of fact, we cannot disturb his ultimate determination that Sroufe's advice was untainted by conflict of interest because calling McCraney as a witness at trial was not a plausible alternative to pursue. The record amply supports that determination: as the trial judge said, Sroufe articulated "compelling" reasons why testifying would have been contrary to McCraney's own best interests. We agree with the trial judge that McCraney's testimony would have been devastating to his defense, for had he taken the stand he would have admitted that (1) on New Year's Eve, as Sue Ann Mascall testified, he and Stewart were firing their guns outside 1600 E Street (guns linked by other evidence to Rosebure's murder the next day); (2) he had been robbed by Rosebure (and thus had an animus against him); (3) he disappeared (i.e., fled) for six months immediately after the shooting; (4) he

---

64. *Veney*, 738 A.2d at 1193 n. 10 (D.C.1999) (quoting *Gambino*, 864 F.2d at 1070); *accord Malede v. United States*, 767 A.2d 267, 272 (D.C.2001) (quoting *United States v. Stantini*, 85 F.3d 9, 16 (2d Cir.1996) and other cited authorities).

65. "Any 'factual finding anchored in credibility assessments derived from personal observations of the witnesses is beyond appellate reversal unless those factual findings are clearly erroneous.'" *Hill v. United States*, 664 A.2d 347, 353 n. 10 (D.C.1995) (quoting *United States v. McNeal*, 955 F.2d 1067, 1072 (6th Cir.1992)).

66. See footnote 55, *supra*.

67. "The doctrine of inherent incredibility can be invoked only when the testimony can be 'disprove[d] ... as a matter of logic by the uncontradicted facts or by scientific evidence,' or when 'the person whose testimony is under scrutiny made allegations which seem highly questionable in the light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave.'" *In re A.H.B.*, 491 A.2d 490, 496 n. 8 (D.C.1985) (quoting *Jackson v. United States*, 122 U.S.App. D.C. 324, 329, 353 F.2d 862, 867 (1965)).

owned and drove the car in which the murder weapons later were found; and (5) he could not explain how those weapons came to be in the trunk of his car. It appeared, moreover, that McCraney had no credible explanation why Sue Ann Mascall would have accused him falsely or in error. And while McCraney could have testified in support of his alibi (filling in the gaps when his aunt and uncle admittedly were not home), that alibi was a double-edged sword, because it tied him to Xavier Gray, who did not testify and who, according to Hart, was with McCraney and Stewart in the alley behind 1600 E Street immediately before and after the shooting.

It might be argued that McCraney had nothing to lose by testifying because the government's evidence against him was overwhelming. McCraney undoubtedly had a constitutional right to testify in his own defense, and perhaps his only chance at obtaining an acquittal would have been to take the stand, stoutly deny his guilt, and hope his sincerity would shine through. That argument in favor of testifying may appear compelling *now*, with the benefit of hindsight, but we doubt that it would have seemed so compelling when the decision had to be made. Be that as it may, on the record before us, and given the validity of the judge's finding that McCraney would not have implicated Ricardo Mascall, the probability that McCraney would have helped himself by taking the witness stand strikes us as vanishingly small—too infinitesimal to establish that Sroufe's advice to McCraney was affected adversely by her potential conflict. McCraney thus has not shown that the conflict deprived him of his Sixth Amendment right to counsel's effective assistance.

## IV. Conclusion

Having found no reversible errors on the part of the trial judge, we uphold appellants' convictions and the denials of their post-conviction motions for relief. In each case, we therefore affirm the judgment and order of the Superior Court.[68]

---

**68.** Appellants' second-degree murder convictions merge into their first-degree murder convictions and hence should be vacated on remand. The PFCV convictions predicated on the second-degree murder counts are likewise to be vacated, as they are duplicative of the PFCV convictions associated with the first-degree murder counts.